**In re REGIONAL BUILDING SYSTEMS, INC., Debtor.**

No. 93–5–7521–JS.

United States Bankruptcy Court,
D. Maryland,
at Baltimore.

Feb. 23, 2001.

Marc R. Kivitz, Baltimore, MD, for debtor.

Gilbert Backenroth, Hahn & Hessen LLP, New York City, pro se.

Jeffrey R. Hughes, Grand Rapids, MI, pro se.

Robert J. MacPherson, Postner & Rubin, New York City, pro se.

Susan B. Naftulin, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, pro se.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, pro se.

William H. Roth, New York City, pro se.

Prince A. Thomas, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, pro se.

Irving E. Walker c/o Saul Ewing LLP, Baltimore, MD, pro se.

Lynne Ann Battaglia, Office of the U.S. Attorney, Martin T. Fletcher, William L. Hallam, Joyce A. Kuhns, Saul Ewing LLP, Linda V. Donhauser, Miles and Stockbridge, Eric B. Miller, Piper Marbury, et al., F. Thomas Rafferty, Josef E. Rosenblatt, Breitbart and Assoc., Douglas H. Seitz, Scaldara and Potler, Daniel O'C Tracy, Jr., Venable, Baetjer and Howard, Gerard R. Vetter, Goldman and Vetter, Baltimore, MD, Barbara M. Cook, Howard County Office of Law, Ellicott, MD, Joel D. Dahnke, Cohen, Gettings, et al., Arlington, VA, Dennis W. King, Towson, MD, Mark N. Parry, Moses & Singer LLP, New York City, Joseph L. Steinfeld, Jr., Fairfax, VA, for creditors.

Lawrence D. Coppel, Baltimore, MD, for interested party.

## DECISION RE PLAN COMMITTEE'S OBJECTION TO CLAIM OF BEDFORD CONSTRUCTION COMPANY

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The Plan Committee in this case has objected to the claims asserted by Bedford Construction Company ("Bedford"). Bedford asserts claims with respect to work Bedford performed for the debtor, Regional Building Systems, Inc. ("RBS") at a site on Staten Island, New York, owned by Aspen Knolls Corporation ("Aspen Knolls"). The court concludes that Bedford is entitled to recover $22,067.82, and that the balance of its claims must be disallowed.

### I

RBS was engaged in the manufacture and sale of modular housing units. In December 1991, RBS and Aspen Knolls[1] entered into a contract ("the Aspen Knolls Contract") calling for RBS to manufacture, deliver, and install 1,000 modular housing units on the Aspen Knolls site.[2] Aspen Knolls was responsible for completing the finishing work to the modular units, including installation of windows and doors.

In February 1992, RBS and Bedford entered into a subcontract ("the Bedford Subcontract" or, for short, "the Subcontract") under which, on the one hand, RBS was to manufacture the modular housing

---

1. The contract was signed by Aspen Knolls Construction Corp. as agent for Aspen Knolls Corporation. The use of "Aspen Knolls" will refer to both entities.

2. Pursuant to a contract between Aspen Knolls and the Navy, Aspen Knolls was to develop the site, which was then unimproved, build residential buildings, and then .lease them to the Navy as part of what was slated to be a new U.S. Naval Base.

units in Maryland, and then ship them to a staging area in New York, and, on the other hand, Bedford was to transport the units to the Aspen Knolls site, and to erect and complete the construction of the modular housing units.

The Aspen Knolls Contract was RBS's primary source of revenue. Beginning in late 1992, Aspen Knolls committed a series of payment defaults to RBS, disrupting RBS's cash flow and necessitating suspensions of work from time to time. Eventually, in July 1993, Aspen Knolls ceased paying any money to RBS at all. In those circumstances, RBS was forced to terminate the Aspen Knolls Contract and the Bedford Subcontract.

Prior to termination of the Subcontract, Bedford performed work for RBS under the Subcontract.

Bedford also did work for RBS outside the Subcontract, which included completion of repetitive or routine carpentry adjustments or repairs to the modular units, usually before they were erected. This work was supervised by Bedford and separately invoiced to RBS as "Reimbursable Expenses."

In addition, Bedford loaned union carpenters to RBS in order for RBS to supervise completion of certain carpentry items on the modular units after Aspen Knolls completed its "walk-through" under the Aspen Knolls Contract. These union carpenters were supervised by RBS and their time was separately billed to RBS as "Reimbursable Labor."

Bedford also did other work for Aspen Knolls at the job site, for which RBS was not responsible, including a contract entered into November 30, 1992 for finishing work on the modular units for a total amount of $2.2 million ("Aspen Knolls Trim Work Contract") and possibly other carpentry work not covered by the Aspen Knolls Trim Work Contract.[3]

RBS eventually filed its voluntary petition under chapter 11 of the Bankruptcy Code on November 9, 1993. The court set a March 1994 bar date for creditors to file unsecured claims in RBS's chapter 11 case. Bedford filed no proof of claim by that bar date. However, the schedules RBS filed under F.R. Bankr.P. 1007 scheduled Bedford as holding an unsecured claim, not entitled to priority under 11 U.S.C. § 503(a), in the amount of $614,203.46. As will be seen, Bedford looks to that scheduled amount as the basis for payment of any unsecured claim it may have had against RBS to the extent that the court rejects Bedford's assertion of status of a beneficiary of a statutory trust for which RBS was the trustee under New York law.

The court confirmed a liquidating plan in this case under 11 U.S.C. § 1129 in May 1997 ("the Plan").[4] In April 1997, RBS had made a recovery from Aspen Knolls of approximately $5 million, and which is the major source of funds held for distribution in this case. As provided by § 1.5 of the Plan, the funds RBS received from Aspen Knolls constituted the Aspen Knolls New York Lienholder Distribution Fund ("the Fund") and were deposited by the Plan Committee into an account segregated from other estate funds, with the Plan Committee to administer that Fund in accordance with the terms of the Plan.

---

**3.** There were other Bedford–Aspen Knolls contracts for site clearing and drainage work, for sanitary and storm sewers, and for general excavation and placing of concrete foundations for the modular units.

**4.** The Plan created the Plan Committee and vested it with all duties, powers and responsibilities of a trustee pursuant to 11 U.S.C. § 1104. Accordingly, the Committee has the authority to object to claims.

The Plan called for full payment from the Fund of any Allowed New York Lienholder Claim.[5] An Allowed New York Lienholder Claim was any claim's portion that is "valid under Article 3A [sic] of the New York Lien Law," and allowed as such by a final order of the court. Plan § 1.3. Article 3–A of the New York Lien Law is entitled Definition and Enforcement of Trusts and consists of N.Y. Lien Law §§ 70 through 79–a (McKinney 1993).[6] Although labeled by the plan as "lienholder" claims, the New York Lienholder Claims are in fact statutory trust claims.

The Plan required claims asserting status as New York Lienholder Claims to be filed by a deadline, and provided that all such claims are deemed to be disputed with the validity and allowance of such claims to be determined by the court. Plan § 4.4(a). Bedford timely filed a New York Lienholder Claim of $1,448,226.49 plus interest.

To the extent not entitled to treatment as an Allowed New York Lienholder Claim, unsecured claims not entitled to priority treatment under 11 U.S.C. § 503(a) are to receive payment only from the funds the Plan Committee holds that are unnecessary for the full payment of Allowed New York Lienholder Claims.

Bedford has asserted (1) that on the petition date of November 9, 1993, it held valid claims against the debtor of $1,448,226.49, (2) that those claims are entitled to full payment as Allowed New York Lienholder Claims, (3) that interest on those claims is entitled to treatment as an Allowed New York Lienholder Claim, and (4) that to the extent that the claims are not entitled to Allowed New York Lienholder Claim status, then the claims

owed Bedford on the petition date are entitled to share in distribution as unsecured claims up to the amount of $614,203.46 listed on the RBS's schedules.

Pursuant to the court's entry on October 1, 1998, of a Stipulation and Consent Order Allowing and Authorizing Payment of, the Undisputed Portion of the New York Lienholder Claim Made by Bedford Construction Corp., the Plan Committee paid $718,128.83 to Bedford as the amount that the Plan Committee did not dispute was owed to Bedford as an Allowed New York Lienholder Claim under the Plan. The Plan Committee disputes its obligation to pay Bedford any more than the $718,128.83 already paid.

## II

The court examines first Bedford's New York Lienholder Claims and concludes in part III that, except for the claim for interest and a claim for termination damages, the claims are enforceable as Allowed New York Lienholder Claims if the claims would be valid claims against RBS outside of the N.Y. Lien Law.

Bedford's New York Lienholder Claims that remain in dispute are shown on the chart below:

BEDFORD'S NEW YORK LIENHOLDER CLAIMS REMAINING IN DISPUTE

| | |
|---|---|
| Interest: | $239,184.16 |
| Crane Costs Arising from Early Termination: | |
| Disassembly of cranes and transportation | $ 13,675.68 |
| Premature termination of rental equipment lease | $ 90,835.00 |
| Reimbursable Expenses: | |
| Invoice dated 7/26/93 | $ 10,168.36 |

---

**5.** Plan §§ 1.5, 3.4, 4.3, and 4.4.

**6.** Citations to the New York Lien Law hereafter will simply be to the pertinent N.Y. Lien

Law section without noting the court's use of the 1993 edition of McKinney's Consolidated Laws of New York Annotated.

First Floor Set (Partial Completion):

$89,352.00 claimed, of which
disputed is .................. $ 40,472.00

Delay Claims:

Delay Claim # 1 ... $ 97,119.22
Delay Claim # 2 ... $ 30,195.00
Delay Claim # 3 ... $170,402.68
Delay Claim # 4 ... $ 39,645.55[7]

Subtotal ... $337,362.45 .. $337,362.45

TOTAL $731,697.65

The Plan Committee contends that, as a matter of law, even if Bedford's claims were otherwise valid claims, four of those claims would not qualify as the types of claims that may be paid from a New York Lien Law trust: Bedford's claims for (1) interest; (2) delay claims; (3) disassembly and transportation of cranes; and (4) early termination of Bedford's crane lease with United Rental Equipment Company, Inc. Accordingly, the court turns to that argument next.

## III

## THE APPLICABILITY OF NEW YORK LIEN LAW TO BEDFORD'S CLAIMS

■ As previously noted, for Bedford to have an Allowed New York Lienholder Claim, the claim must be one valid under Article 3–A of the New York Lien Law (N.Y. Lien Law §§ 70 through 79–a). New York Lien Law § 70(1) and (2) create three types of trusts, a trust of which an owner is the trustee (a so-called "owner trust"), a trust of which a contractor is the trustee (a so-called "contractor trust"), and a trust of which a subcontractor is the trustee (a so-called "subcontractor trust"). The funds RBS received from Aspen Knolls constituted a contractor trust. *See*

N.Y. Lien Law § 70(6)(a) (specifying that the assets of a contractor trust include funds received by the contractor under a contract for the improvement of real property). The Plan Committee's argument turns on whether Bedford's claims are among the types of claims that the New York Lien Law authorizes to be paid from a contractor trust. The court addresses six questions in this regard:

(1) what claims generally may be paid from a contractor's trust (part A, below);

(2) whether a claim has to be valid under non-New York Lien Law in order to be asserted against a trust under New York Lien Law Article 3–A (part B, below);

(3) whether the claim has to be a "cost of improvement" as defined in N.Y. Lien Law § 2(5) in order to be asserted against the contractor trust (part C, below);

(4) whether a claim for interest may be recovered from such a contractor trust (part D, below);

(5) whether claims for damages arising from delay may be recovered from such a contractor's trust (part E, below); and

(6) whether a subcontractor's claims for increased lease costs and for disassembling and transporting cranes from the job site after termination of the subcontract may be recovered from such a contractor's trust (part F, below).

## A.

The parties agree that pursuant to N.Y. Lien Law § 70(1), the Fund is a trust over which RBS was the trustee.[8] The question

7. Bedford originally claimed this amount was $37,245.55, but it subsequently claimed the amount should be $39,645.55.

8. In pertinent part, N.Y. Lien Law § 70 provides:

§ 70. Definition of trusts
1. The funds described in this section ... received by a contractor under or in connection with a contract for an improvement of real property ... shall constitute

is whether Bedford's claims, including its claim for interest, are among the claims that are entitled to be paid from the trust. In pertinent part, N.Y. Lien Law § 71, the provision governing what claims may be paid from a Lien Law trust, provides:

### § 71. Purpose of the trust; "trust claims"; "beneficiaries"

...

2. The trust assets of which a contractor ... is trustee shall be held and applied for *the following expenditures arising out of the improvement of real property* ... and incurred in the performance of his contract ...:

(a) *payment of claims of subcontractors,* architects, engineers, surveyors, laborers and materialmen;

So the funds RBS received from Aspen Knolls were trust assets[9] that RBS was required to hold and apply for payment of any claims of Bedford as its subcontractor if payment of such claims would qualify as "expenditures arising out of the improvement of [Aspen Knolls'] real property ...

and incurred [by RBS] in the performance of [its] contract" with Aspen Knolls. To the extent that Bedford has any such claims, they constitute "trust claims" and Bedford is a "beneficiary" of the trust.[10]

### B.

Bedford urges that the disputed claims represent expenditures by Bedford in the performance of the Bedford Subcontract that arose out of the improvement of the real property within the contemplation of § 71(2). Accordingly, argues Bedford, it is entitled to recover for its expenditures from the trust even if it has no contractual right to recover such expenditures:

> The parties to this trial have moved beyond the phase of litigating contractual liabilities and rights. The question here is whether Bedford has made expenditures whose compensation is part of the trust fund held ... by RBS.

Bedford Pretrial Brief at 16.[11] The court rejects this argument. In the case of a

---

assets of a trust for the purposes provided in section seventy-one of this chapter.

2. ... The funds received by a contractor ..., under or in connection with each contract ..., shall be a separate trust and the contractor ... shall be the trustee thereof.

3. ... The trust of which a contractor ... is trustee shall continue with respect to every asset of the trust until every trust claim arising at any time prior to the completion of the contract ... has been paid or discharged, or until all such assets have been applied for the purposes of the trust. Upon termination of the trust by payment or discharge of all the trust claims, the beneficial interest in any remaining assets shall vest in the ... contractor ....

...

6. The assets of the trust of which a contractor is trustee are the funds received by him ...

(a) under the contract for the improvement of real property ....

9. RBS has not attempted to argue that any of the funds it received from Aspen Knolls are

not trust assets because they were for lost profits caused by Aspen Knolls' breaching the contract by not permitting RBS to complete the project. The issue is an academic one because the funds RBS received vastly exceed the subcontractor claims asserted against the funds.

10. *See* N.Y. Lien Law § 71(3) and (4), which provide in pertinent part:

3. (a) ....

(b) With respect to the trusts of which a contractor ... is trustee, "trust claims" means claims arising at any time for payments for which the trustee is authorized to use trust funds as provided in subdivision two of this section.

....

4. Persons having claims for payment of amounts for which the trustee is authorized to sue trust assets as provided in this section are beneficiaries of the trust ....

11. Bedford similarly argued:

The definitions of "improvement" and "cost of improvement" in § 2 of the Lien

trust held by a contractor, § 71(2) authorizes the contractor to use the trust to make expenditures to pay "claims" of subcontractors. The focus is not on the subcontractor's expenditures, but on whether the contractor may make an expenditure from the trust to pay the subcontractor's claim under its subcontract with the contractor. Section 71(2) does not enlarge the claims that a subcontractor is entitled to assert against a contractor. Rather, it merely establishes the right of the subcontractor to recover claims from the trust if payment of the claims would qualify as an expenditure incurred by the contractor arising out of the improvement of the real property. Accordingly, Bedford is not entitled to recover its expenditures from the trust unless (1) its contract rights entitle it to a claim for such expenditures, and (2) the claim is of a type that N.Y. Lien Law

§ 71(2) authorizes RBS to pay from the trust.

### C.

Bedford's claims need not qualify as a "cost of improvement" in order to be entitled to payment from the trust. Nevertheless, as will be seen, decisions interpreting the term "cost of improvement" in § 2(5) often are relevant in interpreting the term "improvement" in N.Y. Lien Law § 2(4), and thus in interpreting what claims "arising out of the improvement" may be paid by a contractor under N.Y. Lien Law § 71(2).

The term "cost of improvement" is defined in N.Y. Lien Law § 2(5), and as relevant here, is limited to **"expenditures incurred by the owner** in paying the claims of a contractor ... or ... a subcontractor, laborer and materialman, arising out of the improvement." [12]

---

Law rely entirely on the term "value" and *nowhere* refer to contract price or payment terms governed by contract.

... Moreover, § 71(2) and § 71(3)(b) referring to "claims *arising any time*" (emphasis added) does not limit "trust claims" to contract entitlement but rather to "expenditures."

Bedford Pretrial Brief at p. 18 (emphases in original).

12. In full, N.Y. Lien Law § 2(5) provides (emphasis added):

5. Cost of improvement. The term "cost of improvement," when used in this chapter, means **expenditures incurred by the owner in paying the claims of a contractor,** an architect, engineer or surveyor, **a subcontractor,** laborer and materialman, **arising out of the improvement,** and in paying the amount of taxes based on payrolls including such persons and withheld or required to be withheld and taxes based on the purchase price or value of materials or equipment required to be installed or furnished in connection with the performance of the improvement, payment of taxes and unemployment insurance and other contributions due by reason of the employment out of which any such claim arose, and payment of any benefits or wage sup-

plements or the amounts necessary to provide such benefits or furnish such supplements, to the extent that the owner, as employer, is obligated to pay or provide such benefits or furnish such supplements by any agreement to which he is a party, and shall also include fair and reasonable sums paid for obtaining building loan and subsequent financing, premiums on bond or bonds filed pursuant to section thirty-seven of this chapter or required by any such building loan contract or by any lease to be mortgaged pursuant thereto, or required by any mortgage to be subordinated to the building loan mortgage, premiums on bond or bonds filed to discharge liens, sums paid to take by assignment prior existing mortgages, which are consolidated with building loan mortgages and also the interest charges on such mortgages, sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other encumbrances upon real estate existing prior to the time when the lien provided for in this chapter may attach, sums paid to discharge building loan mortgages whenever recorded, taxes, assessments and water rents existing prior to the commencement of the improvement, and also those accruing during the making of

(Emphasis added.) So the definition itself suggests that the term "cost of improvement" has nothing to do with **expenditures incurred by a contractor** that are to be paid from a trust under N.Y. Lien Law §§ 70 and 71 of which the contractor is trustee. Moreover, the term "cost of improvement" is not used in the parts of N.Y. Lien Law §§ 70 and 71 that specifically address a trust of which a contractor is the trustee. Rather, the term "cost of improvement" is used in the provisions of N.Y. Lien Law § 71 that deal with a trust for funds received by an owner of which the owner is the trustee under N.Y. Lien Law § 70(1) and (5). Specifically, N.Y. lien Law § 71(1) provides in relevant part:

1. The trust assets of which an owner is trustee under subdivisions five(a) to five(f), inclusive, of section seventy of this chapter shall be held and applied for payment of the cost of improvement. . . .

The "trust claims" which may be paid from the trust are only those claims for which the owner is obligated. N.Y. Lien Law § 71(3)(a) provides in relevant part:

3. (a) With respect to the trust of which an owner is trustee, "trust claims" means claims of contractors, subcontractors, . . . laborers and materialmen arising out of the improvement, for which the owner is obligated, and also means any obligation of the owner incurred in connection with the improvement for a payment or expenditure defined as cost of improvement.

In turn, N.Y. Lien Law § 71(4) provides in relevant part:

4. . . . Where an owner becomes obligated to incur an expenditure as part of the cost of improvement, any person to whom he is obligated is a beneficiary.

So the term "cost of improvement" simply is inapplicable to this case.

### D.

The court concludes that interest is not recoverable from a trust arising under N.Y. Lien Law § 70.

### 1.

■ Based on the definition of "cost of improvement" in N.Y. Lien Law § 2(5),[13] which applies to the use of that term in N.Y. Lien Law § 71(1), the courts have held that interest is not one of the claims that may be paid from a trust under N.Y. Lien Law § 71. *Tri–City Elec. Co., Inc. v. People,* 63 N.Y.2d 969, 483 N.Y.S.2d 990, 473 N.E.2d 240, 241 (1984), *aff'g,* 96 A.D.2d 146, 468 N.Y.S.2d 283 (1983); *Northern Structures, Inc. v. Union Bank,* 57 A.D.2d 360, 394 N.Y.S.2d 964, 970 (1977), *opinion amended,* 58 A.D.2d 1042, 396 N.Y.S.2d 1021 (1977), *appeal granted,* 43 N.Y.2d 646, 402 N.Y.S.2d 1028, 373 N.E.2d 997 (1978); *Gruenberg v. United States,* 29 A.D.2d 527, 285 N.Y.S.2d 962 (1967). Because, as discussed in part C, above, N.Y. Lien Law § 71(2), the provision governing what may be paid from a trust of which a contractor is the trustee, does not contain the term "cost of improvement," it would

---

the improvement, and interest on building loan mortgages, ground rent and premiums on insurance likewise accruing during the making of the improvement. The application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage or other mortgage shall be

deemed to be an expenditure within the "cost of improvement" as above defined; provided, however, such payments are itemized in the building loan contract and/or other mortgage other than a building loan mortgage, and provided further, that the payments have been made subsequent to the commencement of the improvement.

**13.** The text of § 2(5) is set forth in n. 12.

appear that the stated rationale of these decisions would not necessarily apply to a contractor trust under § 71(2).

But *Tri–City* involved a surety who had stepped into the shoes of a contractor and who became a trustee of a contractor trust for the benefit of the contractor's subcontractors. *See Tri–City*, 468 N.Y.S.2d at 288. So *Tri–City's* holding applies to the contractor trust involved here.[14]

### 2.

Even if *Tri–City* had not involved a contractor trust, or if Bedford could urge that *Tri–City* should be disregarded because its stated rationale (the rationale of *Gruenberg* regarding an owner trust) did not address a contractor trust, the court would nevertheless conclude that *Tri–City* would compel a holding that interest may not be paid from a contractor trust. That is to say, the *Gruenberg* rationale embraced by *Tri–City* necessarily compels the conclusion that interest is not a part of a claim that may be paid from a contractor trust under § 71(2). In *Gruenberg*, the court reasoned:

> ... interest may not be allowed as part of the "cost of improvement" claimed under Article 2–A of the Lien Law. In Secs. 3 and 5 of the Lien Law it is expressly provided that the lien afforded includes interest on, as well as the principal amount of, the claim. Article 2–A of the Lien Law, however, omits reference to interest but provides trust protection for the "cost of improvement." (Lien Law, Sec. 71, Subds. 1, 3–(a)). Under subd. 5 of sec. 2 of the Lien Law "cost of improvement" is defined in detail, but interest on the "cost" is not included, except interest charges on prior existing mortgages and on building loan mortgages.

*Gruenberg*, 285 N.Y.S.2d at 963.

Under § 2(5), the "cost of improvement" includes "expenditures incurred by the owner in paying the claims of a contractor ... arising out of the improvement" and thus seems broad enough to include the interest component of such claims. Accordingly, *Gruenberg* necessarily interpreted the term "claims" in § 2(5) as not including interest. Arguments can be made that *Gruenberg*, and hence *Tri–City*, adopted an erroneous interpretation.[15]

---

**14.** Similarly, *St. Paul Fire & Marine Insurance Co. v. New Jersey Bank & Trust Co.*, 137 N.J.Super. 294, 349 A.2d 65 (1971), extended the holding of *Gruenberg* to a N.Y. Lien Law trust for which the contractor, not the owner, was the trustee.

**15.** First, the mention of interest on contractor's claims protected by a mechanic's lien under § 3 and by a lien on public improvements under § 5 does not negate the natural reading of "claim" in § 2(5) as including interest owed as part of the claim. Section 3 provides for a lien "for the principal and interest, of the value, or the agreed price, of such labor ... or materials upon the real property improved." By specifically mentioning both principal and interest, § 3 does not negate the natural reading of "claim" as including both principal and interest.

Second, no negative inference should be drawn from the failure to mention interest on a contractor's claim as a "cost of improvement" despite the mention in § 2(5) of interest on mortgages. It appears that interest on mortgages had to be addressed in the definition of a "cost of improvement" because the legislature decided that certain kinds of interest on mortgages, **but not all such interest**, ought to qualify as a "cost of improvement" that could be paid from an owner's trust. For example, in the case of interest upon mortgages consolidated into the building loan mortgage, all interest qualifies as a "cost of improvement" under § 2(5) presumably so that the consolidation via payment can take place without violating the statutory trust. In the case of interest on the building loan mortgage itself, interest constituting a "cost of improvement" is limited to "interest accruing during the making of the improvement." N.Y. Lien Law § 2(5). This permits the owner to use the trust to make interest payments accruing during the period that improve-

But this court is bound by *Tri–City* as a decision of the highest court of New York.

Accordingly, the *Gruenberg* rationale established that interest is not a part of the "claims of a contractor" payable as a "cost of improvement," as defined in § 2(5), from an owner's trust under § 71(1). Can interest nevertheless be part of the "claims of subcontractors" payable from a contractor's trust under § 71(2)(a)? In other words, ought the term "claims" in § 71(2)(a) be given a different interpretation than the term "claims" in § 2(5) which is incorporated into § 71(1)?

Both § 71(1) and 71(2)(a) address similar subjects, the payment of claims from an owner's trust (§ 71(1)) and the payment of claims from a contractor's trust (§ 71(2)). When an identical term (here, "claims") is used in two different provisions of the same statute, addressing similar topics, the term ordinarily ought to be given the same interpretation in both provisions unless the statute indicates an intention to the contrary. N.Y. Stat. Law § 236 (McKinney 2000); *People v. Bolden*, 81 N.Y.2d 146, 597 N.Y.S.2d 270, 613 N.E.2d 145, 147 (1993); *Catlin v. Sobol*, 77 N.Y.2d 552, 569 N.Y.S.2d 353, 571 N.E.2d 661, 665 (1991); *Mangam v. City of Brooklyn*, 98 N.Y. 585, 592 (1885). Moreover, a statute "is to be construed as a whole," and its provisions "are to be read and construed together to determine the legislative intent." N.Y. Stat. Law § 97 (McKinney 2000). And different provisions "must be harmonized with each oth-

er." N.Y. Stat. Law § 98 (McKinney 2000). It is exceedingly unlikely that the legislature intended that interest owed to a contractor as part of its claim for improving real property would not be recoverable from an owner trust under § 71(1) but that interest owed to a subcontractor as part of its claims for improving real property would be recoverable from a contractor trust under § 71(2)(a). There is no rhyme or reason for there being a different result.

### 3.

Bedford urges that owner trusts and contractor trusts under the Lien Law should be treated differently, quoting Bowmar, *Mechanics Liens in New York* (Lawyer's Cooperative Publishing, 1992) at p. 457:

> Unlike trust claims under an owner trust, for payment of which the owner must be "obligated," [see § 71(3)(a) ] the trust claims under the contractor trust need only be such as the trustee is "authorized" [see § 71(3)(b) ] to pay.

This distinction between § 71(3)(a) and 71(3)(b) is irrelevant to the analysis of whether interest should be treated as part of "claims" that may be paid under § 71(1) and 71(2)(a). Whether a claim is described as one "obligated" to be paid or as one "authorized" to be paid does not add anything to whether the claim that may be paid includes interest.

### 4.

Nor did an intervening amendment to the Lien Law overrule *Tri–City*. In 1985,

ments are being made. To thus limit the owner in paying interest from the trust makes sense because the building loan mortgage, when timely recorded, itself secures the maker of the building loan ahead of materialmen liens. N.Y. Lien Law § 22. There was no reason for the legislature to permit the trust to be used to pay interest incurred after the improvement is completed.

Finally, the interpretation adopted by the New York courts causes an unfair result. A beneficiary of the trust who is entitled to recover a valid principal claim of $1,000 from $1,000 of principal in the trust is deprived of interest earned on that principal. The trustee retains for payment to all of the trustee's creditors any interest earned on the $1,000 of principal, thus making those creditors beneficiaries of delay in payment of the trust claim.

the year after *Tri–City* was decided, the legislature made an amendment to address recovery of interest in the case of a diversion. N.Y. Lien Law § 77(3)(a)(i). But when enacting an amendment, the legislature is presumed to know and be aware of the existing law. N.Y. Stat. Law § 222 (McKinney 2000). By addressing interest in the case of a diversion, but failing to address interest when there has been no diversion, the legislature only strengthened the earlier interpretation of the statute as not providing for interest owed a subcontractor to be treated as part of the claims authorized to be paid from an owner or contractor trust. *See also* N.Y. Stat. Law § 240 (McKinney 2000) (entitled "Expression of one thing as excluding others").

■ Moreover, § 77(3)(a)(i) addresses granting relief to "identify and recover trust assets in the hands of any person together with interest accrued thereon from the time of the diversion." When there has been a diversion, § 77(3)(a)(i) authorizes the recovery of trust assets with interest from the time of the diversion at "the rate equal to the underpayment rate set by the commissioner of taxation and finance pursuant to subsection (e) of section one thousand ninety-six of the tax law." A N.Y. Lien Law trust includes any interest earned on the trust assets. *See Astrove Plumbing & Heating Corp. v. Jobbers' Credit Ass'n, Inc.*, 96 Misc.2d 420, 409 N.Y.S.2d 341, 345–46 (Sup.Ct.1978).[16]

RBS owed Bedford interest under N.Y. C.P.L.R. §§ 5001 and 5004 at 9% per annum (because the Subcontract was silent regarding interest). Section 77(3)(a)(i) has nothing to do with whether that interest claim is a claim authorized to be paid under § 71. Instead, § 77(3)(a)(i) addresses a wholly different issue: recovery of interest (at a rate wholly unrelated to the amount of interest owed to claimants) in order to restore the trust to the approximate size to which the fund would have grown with interest had there been no diversion.

Under Bedford's interpretation of the statute, upon showing a diversion, Bedford can recover interest on amounts kept in the trust that were never diverted, and, indeed, Bedford can recover such interest on such non-diverted funds even if only $1.00 had been diverted. Bedford reads the statute as providing that Bedford may "recover trust assets in the hands of any person [including assets never diverted from the trust] together with interest accrued thereon from the time of the diversion [of any amount]." A common sense reading of the statute requires rejection of that absurd interpretation. By using the words "the diversion" instead of "a diversion," the legislature meant for the use of the word "diversion" to refer back to something. What the term logically refers back to is the trust assets being recovered. In the case of trust funds not diverted, there would be no diversion, and no necessity to recover such assets with interest from a nonexistent date of diversion.

■ The term "recovery" in § 77(3)(a)(i) is not used in the sense of obtaining a distribution. The subject of obtaining a distribution is addressed instead in § 77(3)(a)(vi). Section 77(3)(a)(vi) authorizes the granting of the following relief:

> An order for distribution of any trust assets available for distribution, either with respect to the entire trust or with

16. That is an academic issue here because the principal of the Fund, even without accrued interest, would be sufficient to pay Bedford's entire claim. In *Astrove,* in contrast, the interest earned on the trust principal was distributed to the trust beneficiaries on a pro rata basis, but the trust principal was inadequate to pay their claims in full and hence was itself distributed on a pro rata basis.

respect to particular assets of the trust or for retention of particular assets for future distribution. Where the holder of any trust assets is a trustee or a transferee who received the assets with knowledge that they were trust funds, **an order for distribution** and retention for future distribution **of any trust assets shall include the amount of diverted funds plus interest from the time of the diversion to the date of such order.**

[Emphasis added.] This demonstrates that it is only the amount of diverted funds that is to bear interest. Additionally, this provision simply contemplates that the trust assets available for distribution shall include (1) diverted funds and (2) interest recovered on diverted funds from the time of diversion. It does not purport to alter what trust claims are payable under § 71. The inclusion of recovered interest in the trust assets to be distributed benefits the trust claimants because if there are insufficient trust assets (before including interest recovered on diverted funds) fully to pay proper trust claims, the inclusion of recovered interest to the trust assets will add to the amounts available for payment of such proper claims. The provision deals with the disposition of **interest recovered at the rate fixed by § 77(a)(3)(i) on diverted funds** (mandating that they be treated as amongst the trust assets to be distributed), not with the wholly different question of payment of **interest earned on claims at a rate fixed instead by contract** (or fixed by N.Y. C.P.L.R. §§ 5001 and 5004). This provision does not override *Tri–City* regarding what trust claims are authorized to be paid under § 71, even in the case when there has been a diversion, but most emphatically beyond any doubt in a case in which there has not been a diversion.

█ If a contractor-trustee has made a diversion, thus leading to delay, that may form the basis, pursuant to the concluding clause of § 77(3)(a)(ii), for the court's allowing the trust beneficiaries "to recover damages for breach of trust or participation therein." Such damages are recoverable from the defalcating trustee or other person participating in the diversion. Arguably such damages could include interest for the delay in payment occasioned by the breach of trust.[17] But that does not answer whether the claims authorized by N.Y. Lien Law § 71 to be paid from the trust itself include interest owed a subcontractor under the terms of its subcontract (or under N.Y. C.P.L.R. §§ 5001 and 5004 in the absence of contract terms). The rule in that regard is settled by *Tri–City*.

### 5.

Bedford argues that there was a diversion. But even if there had been a diversion, RBS and the Plan Committee have at all times retained funds in the trust more than sufficient to pay all trust claims, so there was no damage. *See General Crushed Stone Co. v. State*, 23 A.D.2d 250, 260 N.Y.S.2d 32 (1965), *rev'd on other grounds*, 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967). Although N.Y. Lien Law § 77(3)(a)(i) was enacted after *General Crushed Stone*, it makes no sense that interest would become payable **from** a trust (versus **to** a trust) when no harm arose from any diversion, and the legislature gave no indication that it was attempting to overrule *General Crushed Stone*.

---

**17.** If the trust principal and recovered interest on diverted funds is paid only on principal, there would be no added damage from delay that is not already addressed by the inclusion of recovered interest in the trust assets. But if the interest on diverted funds is not necessary to pay trust claims in full, then there has been damage because the claimant has been denied the use of the principal during the delay engendered by the diversion.

6.

In any event, Bedford has not shown that a diversion occurred. There is no evidence showing when any alleged diversion occurred, what funds were diverted, and to whom or how any funds were diverted. The burden was on Bedford to prove a diversion, not on the Plan Committee to negate the existence of a diversion. RBS did not receive the funds from Aspen Knolls pursuant to the arbitration award until April 1997. Immediately upon receipt, RBS deposited the funds in a money market fund at a brokerage firm. Since then, funds have been taken from the account and used to pay claims against RBS only in accordance with the Plan (whose terms bind Bedford under 11 U.S.C. § 1141(a)).

Bedford attempts to establish that a diversion occurred by arguing that there is no evidence that RBS maintained certain required books and records regarding the statutory trust,[18] and thus that the statutory presumption of N.Y. Lien Law § 75(4)[19] establishes that a diversion occurred. But as the claimant attempting to invoke the presumption, Bedford bore the burden of showing the predicate to the presumption, that is, of showing that RBS failed to maintain the relevant books and records.[20]

7.

Bedford finally argues that the funds here are a trust and that interest on a trust is to be held for the benefit of the trust beneficiaries, not the trustee.[21] This principle may generally be true in the case of express trusts, but *Tri–City* makes clear that interest owed a subcontractor is not part of a trust beneficiary's claim that may be paid from a New York Lien Law trust.[22]

**18.** Under N.Y. Lien Law § 75(2) through (3), RBS was required to keep books or records regarding various details of the statutory trust, including the amounts that Aspen Knolls owed it, payments from Aspen Knolls, trust claims payable from the funds, and trust payments made from the funds.

**19.** N.Y. Lien Law § 75(4) provides:

Failure of the trustee to keep the books or records required by this section shall be presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him as money or an instrument for the payment of money for purposes other than a purpose of the trust as specified in section seventy-one of this chapter.

**20.** There is no evidence that Bedford availed itself of the opportunity under N.Y. Lien Law § 76 to request RBS for examination of the relevant books and records, or a verified statement regarding the pertinent entries in the books and records. Nor is there any evidence that it served a request for production of such records in the course of discovery in this contested matter.

**21.** "[T]he contractor-trustee holds the trust assets in a fiduciary capacity akin to that of the trustee of an express trust." *Canron Corp. v. City of New York*, 89 N.Y.2d 147, 652 N.Y.S.2d 211, 674 N.E.2d 1117, 1122 (1996). Accordingly, the contractor-trustee "does not have a sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid." *Aquilino v. United States*, 10 N.Y.2d 271, 219 N.Y.S.2d 254, 176 N.E.2d 826, 832 (1961).

**22.** The Plan Committee alternatively contends that there is no provision in the Plan for paying interest on any Allowed New York Lienholder Claim, and hence that any right Bedford had to interest has been destroyed by the confirmation of the Plan, citing 11 U.S.C. § 1141(c) ("except as otherwise provided in the plan ... the property dealt with by the plan is free and clear of all claims and interests of creditors"). But the confirmed Plan preserved whatever claims Bedford had under Article 3–A of the N.Y. Lien Law, and that necessarily included any interest recoverable from the Fund under the Lien Law.

### E.

The Plan Committee argues that delay damages may not be recovered from a contractor trust under N.Y. Lien Law § 71(2).

### 1.

The Plan Committee relies in part on decisions addressing whether a contractor may assert a mechanics lien for damages arising from the owner's refusal to permit the contractor to complete the building, a breach of contract. The court's research reveals that none of these decisions have ever been cited in a reported decision involving a trust under N.Y. Lien Law § 70. Accordingly, the court proceeds with caution in addressing these decisions.

In *Goldberger–Raabin, Inc. v. 74 Second Ave. Corp.*, 252 N.Y. 336, 169 N.E. 405 (1929), the Court of Appeals held that a contractor could not utilize a mechanic's lien to recover the profits he would have made if the owner had not breached the contract with the engineer by failing to permit the construction of a building to be fully completed, citing *O'Reilly v. Mahoney*, 123 A.D. 275, 108 N.Y.S. 53 (1908), and *J.C. Whritenour Co. v. Colonial Homes Co.*, 209 A.D. 676, 205 N.Y.S. 299 (1924). In *O'Reilly*, the court reasoned that:

> Loss of profits or damages for breach of a contract cannot be recovered in an action to foreclose a mechanic's lien.

The lien is restricted by express provision of the statute to the "price and value" of the labor performed and materials furnished. Any claim for damages for breach of a contract in refusing to allow a contractor to do the work is not within the provisions of the act, and must be enforced in an ordinary action for damages against the contracting party.

*O'Reilly*, 108 N.Y.S. at 54, citing *Doll v. Coogan*, 48 A.D. 121, 62 N.Y.S. 627 (1900), *aff'd*, 168 N.Y. 656, 61 N.E. 1129 (1901), which reasoned similarly.

In *Whritenour*, the court reasoned that:

> The theory upon which the Lien Law grants a lien is that the lienor, by his labor or materials, or both, has added to the value of the property upon which a lien is claimed. Damages caused by a breach of the building contract add nothing to the value of the premises upon which the building is being created, and are not within the purview of the Lien Law.

*Whritenour*, 205 N.Y.S. at 299.[23]

 Similarly, when a contractor agrees with a supplier to buy materials for use in making an improvement, but does not take delivery of the materials, the supplier may not assert a mechanic's lien, *P.T. & L. Construction Co., Inc. v. Winnick*, 59 A.D.2d 368, 399 N.Y.S.2d 712 (1977),[24] and,

---

**23.** The Plan Committee points to *Caristo Construction Corp. v. Diners Financial Corp.*, 21 N.Y.2d 507, 289 N.Y.S.2d 175, 236 N.E.2d 461, 465 (1968), which held, in the case of a subcontractor trust, that the contractor's claim for certain excess costs of construction was not a claim against a N.Y. Lien Law trust fund. But the claim for excess costs in *Caristo* was not a claim of a trust beneficiary against the subcontractor trust. Instead, it was a claim of the contractor against the subcontractor for excess costs the contractor incurred in finishing the job. It would be the equivalent of Aspen Knolls attempting to recover a breach of contract claim against RBS from funds already paid to RBS, and held as a contractor trust to which RBS's subcontractors (but not Aspen Knolls) were entitled to look for payment.

**24.** *P.T. & L.* involved assertion of a lien under N.Y. Lien Law § 5 against amounts due on a contract with the state for furnishing materials for the construction of a public improvement. But if anything, § 5 is even more similar to the provision applicable here, § 71(2), than is § 3 because § 5 places a lien, not on the improvement, but on state moneys

it follows, neither can the claim be paid from the contractor trust. But Bedford's claim is not for material, and hence the court will focus on the issue of whether *Goldberger–Raabin* controls here.

■ Bedford contends that *Goldberger–Raabin* and the cases it cites are inapposite because they involve mechanic's liens where the theory behind the statute is that the owner's property should be subject to a lien only to the extent that the subcontractor added value to the property. In contrast, argues Bedford, a contractor's trust involves amounts which the contractor received under its contract and which he holds in trust for the payment of claims of those subcontractors who worked on the improvement. But as observed in *Canron Corp. v. City of New York*, 89 N.Y.2d 147, 652 N.Y.S.2d 211, 674 N.E.2d 1117, 1121 (1996), with respect to an owner trust under N.Y. Lien Law § 70(1):

> We have consistently recognized that the primary purpose of the Lien Law is to ensure that "those who have directly expended labor and materials to improve real property ... at the direction of the owner or a general contractor" receive payment for the work actually performed. [Citations omitted.]

The decision *Canron* quoted was a mechanic's lien decision. So the primary purpose behind both a mechanic's lien and a contractor's trust is the same under the Lien Law.

Moreover, the propriety of adopting the same rule for both devices is borne out by a close scrutiny of the two statutes. Comparing N.Y. Lien Law § 3 (governing the basis for receipt of a lien) and N.Y. Lien Law § 71(2) (governing the basis for re-

ceiving payment from a contractor trust) reveals that the holding of *Goldberger–Raabin* would apply as well to a subcontractor's claim against a contractor trust for lost profits prevented by a contractor's wrongful termination of the contract. On the one hand, New York Lien Law § 3 provides in relevant part that one

> who **performs labor or furnishes materials for the improvement of real property** ... shall have a lien for the principal and interest, of the value, or the agreed price, of such labor, ... or materials upon the real property improved or to be improved and upon such improvement .... [Emphasis added.]

Accordingly, the decisions denying a mechanic's lien for a claim for lost profits necessarily concluded that such a claim does not constitute performing labor or furnishing material for the improvement of real property.

■ On the other hand, under New York Lien Law § 71(2), as already noted, a claim of a subcontractor may not be paid from a contractor's trust if the claim is not one "arising out of the improvement of real property." It is not enough that the subcontractor have met only the second requirement of § 71(2) that the claim have been "incurred in the performance of [the contractor's] contract" with the owner. An "improvement" is defined as including "erection of a structure upon ... any real property and any work done upon such property or materials furnished for its permanent improvement." N.Y. Lien Law § 2(4). In light of that definition, § 71(2) generally requires that the subcontractor's work have been for the permanent improvement of the real property.[25] Al-

---

"to the extent of the amount due or to become due on such contract," making the lien analogous to a contractor trust for amounts owed or paid to the contractor by the owner.

**25.** The words "permanent improvement" differentiate labor and materials consumed by the improvement as opposed to those which become a part of the plant and equipment of the contractor. *Church E. Gates & Co. v. Jno.*

though the statute contains numerous exceptions (for example, § 2(4) includes as an improvement "the value of materials actually manufactured for but not delivered to the real property"), none of those exceptions apply here, and they serve to reinforce the requirement that—unless an exception applies—a claim payable from a contractor trust must be for work performed for the permanent improvement of the real property. It follows that if a claim for lost profits does not constitute a claim for "labor or . . . materials for the improvement of real property" for purposes of obtaining a lien under § 3, such a claim cannot qualify as a claim payable from a contractor's trust.

■■■ This makes sense. A contractor who wrongly terminates the services of a subcontractor even before construction begins would be liable to the subcontractor for lost profits, but the discharged contractor's replacement who performs the work on the improvement, not the discharged subcontractor, would be the entity entitled to make a claim against the funds that the contractor receives (for constructing the improvement) and holds in trust. Accordingly, a claim for lost profits arising from a breach of contract based on wrongful termination of a contract before construction is completed cannot be asserted as a mechanic's lien or as a claim payable from a contractor's trust.

2.

But does this disqualify Bedford's so-called delay claims from being paid from the contractor trust?[26] The delay claims are for idled laborers and equipment, that is for laborers and equipment necessitated

by the slowdown in construction to be kept on hand, albeit idled and accordingly not actually engaged in performing the construction. At least two decisions by Appellate Divisions of the Supreme Court of New York, not cited by either party, specifically discussed such delay claims, and reached divergent results.

In the first decision, *East Hills Metro, Inc. v. J.M. Dennis Constr. Corp.*, 183 Misc.2d 439, 703 N.Y.S.2d 897 (Sup.Ct. 2000), *aff'd*, 277 A.D.2d 348, 717 N.Y.S.2d 202 (2d Dept.2000), the court addressed a subcontractor who fully performed its contract to assist in constructing a building, and sued to enforce a mechanic's lien for "contractual breaches [that] caused the plaintiff to incur unanticipated costs in performing its obligations under the contract." Characterizing this claim as one for lost profits, the court concluded that the claim was not lienable, partly on the basis of *Goldberger–Raabin*, and partly on the basis that the damages sought exceeded the contract price the owner agreed to pay to the contractor (a limitation on mechanic's liens under N.Y. Lien Law § 4). The decision is of little help because it offers no further analysis why increased costs of performance, albeit arising from the contractor's breach of contract, ought not be lienable as part of the work performed on the improvement.

In the second decision, the court split 3–2, with the majority opinion concluding that despite *Goldberger–Raabin*, delay claims are for the improvement of the real property. *L.B. Foster Co. v. Terry Contracting, Inc.*, 34 A.D.2d 638, 310 N.Y.S.2d 76 (1st Dept. 1970), *motion to dismiss appeal denied*, 27 N.Y.2d 612, 313

---

*F. Stevens Const. Co.*, 220 N.Y. 38, 115 N.E. 22 (1917).

**26.** These delay claims are not claims for the lost use of money on account of a delay in

payment. That would constitute a claim for interest which, as already discussed, may not be paid from a contractor's trust.

N.Y.S.2d 416, 261 N.E.2d 413 (1970), *motion for reargument denied*, 27 N.Y.2d 737, 314 N.Y.S.2d 1029, 262 N.E.2d 683 (1970). No reported decision has discussed this holding of *L.B. Foster*.

The contractor in *L.B. Foster* was performing a public improvement contract for the State of New York, and breached its contract with a subcontractor, Melbros, resulting in Melbros' having to keep laborers on hand—a delay claim similar to Bedford's, as is made clear by the dissent.[27] The majority opinion stated:

> The evidence of breach of contract by [the contractor] is accepted, not in support of any claim for damages, but in support of Melbros' right to disregard the contract price and to press its claim in quantum meruit. Melbros was entitled to so do and obtain a valid mechanic's lien for the fair and reasonable value of the work actually performed. *Wright v. Reusens* (1892), 133 N.Y. 298, 31 N.E. 215; *Hunter v. Walter* (1890), 58 Hun 607, 12 N.Y.S. 60 (Gen.T., 2d Dep't); *Day v. Eisele* (1902), 76 A.D. 304, 78 N.Y.S. 396, 51 A.L.R.2d 1009 (1957).
>
> In the instant case the work was done and led to the ultimate improvement of the property. And as then Judge Crane said in *Goldberger–Raabin, Inc. v. 74 Second Avenue Corp.*, 252 N.Y. 336, 341, 169 N.E. 405, 406, "If such work was an improvement or Necessary part of work done upon such property for its permanent improvement I see no reason why the labor and service in connection with such work should not be covered by the Lien Law.". (Emphasis added [by the *L.B. Foster* court, although this court's electronic version of the opinion fails to indicate any emphasis].)

. . . .

> Construing the statute liberally, and giving to the words "improvement of real property" a broad and comprehensive meaning (Lien Law § 23; *Wahle–Phillips Co. v. Fitzgerald*, 225 N.Y. 137, 140–141, 121 N.E. 763, 764; *Keck v. Charles B. Saxon, Inc.*, 164 Misc. 17, 297 N.Y.S. 7, Callahan, J., aff'd. 254 A.D. 731, 6 N.Y.S.2d 93), **the trial court properly found that the extra work, labor and materials necessitated by [the contractor's] abandonment of the contract constituted an improvement of the State highway** and were lienable (Lien Law § 45). **If an improvement includes "reasonable rental value for the period of actual use of machinery, tools and equipment" and "the value of materials actually manufactured for but not delivered to the real property", as also "any work done upon * * * property or materials furnished for its permanent improvement"** (em-

---

**27.** The dissenting opinion described the facts in greater detail (310 N.Y.S.2d at 79–80):

> The work done [after roughly 1960] was charged at reasonable value. The basis for the latter was that [the contractor] breached its contract in that it improperly supervised the general work, putting Melbros to substantial additional expense in that work was delayed and crews were forced to be kept on hand when no work or an inadequate amount was available. When those breaches reached a substantial proportion, the court allowed a charge at the cost to Melbros rather than the unit prices or the reasonable value of the work.

> Melbros proved that Terry repeatedly breached the contract in not preparing various sites of work or making them available to Melbros. Melbros was so hampered and delayed that it cost it far in excess of the unit prices to do the work involved. Melbros was required to keep full crews on the job for long periods during which, because of [the contractor's] default, there was insufficient work for them to do. Consequently the cost of the labor to Melbros was grossly in excess of what it would have been had [the contractor] performed.

phasis supplied) (Lien Law § 2, Subd. 4), the reasonable value of laborers "kept on hand", together with materials and equipment, would also be an improvement.

. . . .

As for the minority view, we find no support in the cases for the contention that any portion of the Melbros claim was not lienable. Nor is any such contention raised by any of the very knowledgeable counsel for parties to this litigation. *Goldberger–Raabin, Inc. v. 74 Second Avenue Corp., supra,* **also cited in the minority opinion, is not a holding supporting the proposition that any portion of the Melbros claim is not lienable;** that case deals with personal services, and only that portion of such services as was directed to aiding or assisting the procurement of subcontracts or subcontractors was excluded from the lien claim; also excluded were lost profits, arising from failure of an owner to complete the construction of a building, partially begun, because of financial inability. The lost profits in that case were "the profits he would have made if the contract had been fully completed" pursuant to a percentage commission arrangement based upon the contemplated total construction cost of the building, the termination of the construction of which constituted the broken contract.

**We also except to the statement of the dissent that "Any excess cost to which the lienor may have been put represents not value but damages to the lienor resulting from the breach". The distinction is not meaningful since we do not here deal with an anticipatory breach prior to any performance under a contract or damages arising from lost profits incident to failure of Completion of a building commenced.** The theory of the minori-

ty seems to be that where the services are greater in value than the benefit received, then there can be no lien; with this singular theory, not articulated to any point of ready discernibleness, we are unable to agree. And we note it was not developed by the appellants at the trial or on the appeal, nor did it ever figure before in this almost ancient litigation.

*L.B. Foster,* 310 N.Y.S.2d at 77–79 (emphasis added).

The dissent took a different view:

The Lien Law speaks alternately of the agreed price and reasonable value of labor and materials supplied (Lien Law §§ 3, 9, subd. 4). It is not relevant to the questions involved to determine at this point which situations allow recovery of the contract price and which of reasonable value. Obviously where a contract has been breached the owner cannot rely on it as limiting the choice of the lienor (*Wright v. Reusens,* 133 N.Y. 298, 31 N.E. 215). But that hardly disposes of the question. Reasonable value in a lien on real property means the value to which the property was improved by the work done by the lienor (*Goldberger–Raabin, Inc. v. 74 Second Ave. Corp.,* 252 N.Y. 336, 340, 169 N.E. 405, 406).* This in turn is measured by the reasonable value of doing that work. Here, there is no dispute but that the contract unit prices represented the fair value of the work; that is, that the contract price for a foot of excavation was the reasonable value. **Any excess cost to which the lienor may have been put represents not value but damages to the lienor resulting from the breach. To put it in the usual contract phraseology, what Melbros is seeking to lien is damages for delay.** While Melbros would unquestionably be

entitled to recover this sum from [the contractor] in an action on the contract, it remains to be seen whether it can do so in an action to foreclose the lien. Nor is this "extra work". Extra work is work not contemplated in the original contract. **This work was embraced in that contract. It was made more expensive because of defendant's breach.**

FN* From time to time the Legislature has broadened the concept of what services constitute an improvement, but the principle remains unchanged (Blanc, Mechanics' Liens, New York, Partnership. 86, et seq.).

It is quite clear that ordinarily damages for breach of the contract are not lienable. For instance, if the lienor is forced off the job he cannot file a lien for the profit he would have made had he been allowed to complete the contract (Lien Law § 4; 37 N.Y. Jr. Mechanic's Liens, § 134; *Goldberger–Raabin, Inc. v. 74 Second Ave. Corp., supra*). Damages for other types of breach are likewise not recoverable in the action to foreclose the lien (*see* Blanc, Mechanics' Liens, New York, § 14b and cases cited p. 89).

. . .

. . . The majority opinion seeks to bring the item by analogy within the items mentioned in Lien Law section 2, subdivision 4, which defines what constitutes an improvement. The statute includes such items as the cost of plans and drawings, of transporting materials and the rental of machinery. All of these go into the actual cost of providing the materials themselves. **From this it is argued that the cost of standby labor should be included. Possibly it would be if the necessity for standby labor was an incident of the normal progress of the work. Here, where the cost of the standby labor actually exceeded the actual cost of doing that particular work, it**

**cannot be said to be a normal incident but is, as stated, an item of damage for breach due to delay. The majority further takes exception to the cited cases holding that a breach of contract is not lienable because the breach here was of a different character from the ones involved in the decided cases. The difference does not constitute a distinction.**

*L.B. Foster*, 310 N.Y.S.2d at 80–82.

As *L.B. Foster* demonstrates, the question is a confusing one, upon which reasonable minds could differ. Despite the faults in the majority opinion, this court concludes that its ultimate ruling was correct. The majority opinion in *L.B. Foster* looked to specific exceptions to the general rule of § 2(4) that, in order for work to qualify as an improvement, the work or material must actually improve the real property. But those specific exceptions are statutory and reinforce the general rule that absent such an exception the work or material must go into the improvement. However, in *Church E. Gates & Co. v. Jno. F. Stevens Construction Co.*, 220 N.Y. 38, 115 N.E. 22, 24 (1917), the court observed that:

**The labor and materials** that enter into and become a part of the improvement required by a contract or are **necessarily and exclusively used, not as tools and equipment, but in the performance of the particular contract,** are labor and materials within the meaning of the statute. [Emphasis added.]

The critical focus, therefore, is whether the added labor costs occasioned by the contractor's delay were incurred in the performance of the subcontract. That performance can include time spent by laborers necessarily kept on site because of the subcontractor's performance, albeit for a period of time with nothing to do. By being part of the performance cost, such labor time is part of the labor necessarily used in the performance of the contract.

On the other hand, the dissent focuses on value being added, whereas the key is whether the labor, albeit idled, was an added cost recoverable for performance of the contract of improvement, not how much it added to the value. Moreover, in Bedford's favor, a Lien Law mechanic's lien and a Lien Law contractor's trust differ in one regard: a mechanic's lien is limited to the value or contract price of the work performed on the improvement, whereas a contractor's trust is subject to claims of subcontractors for work performed on the improvement without this limitation. In any event, even in the case of mechanic's liens, it is not at all clear that "contract price" does not include the added costs of performance recoverable by a subcontractor in its performance occasioned by the contractor's breach. If a contract specifically provides that the contract price will include the subcontractor's added labor costs of performance arising from any disruption of work by the contractor, then such delay costs are part of the "contract price." The result ought not vary depending on whether such delay costs are recoverable as damages for breach of contract or, instead, recoverable as an element of the agreed compensation of the subcontractor explicitly set forth in the contract. In either event, contract law fixes the recoverable delay costs as an element of the price of performance of the contract, and hence as part of the "contract price." [28]

### F.

Bedford's alleged added crane costs arising on termination of the Subcontract are not claims that may be asserted against a contractor trust under the New York Lien Law. These damage claims are based on the Subcontract's termination preventing Bedford from performing the balance of the Subcontract.

Bedford argues that it is only seeking to recover the actual costs it incurred with respect to the performance it did render. The basis of the claim (as discussed at greater length in part V) is that had termination not occurred, the cranes would have been rented at a lower monthly rental rate (based on the longer period of rental) and that the costs of transportation and disassembly of the cranes would have been spread over a longer period, thus reducing the amount of such costs attributable to each unit delivered. But there was no agreement, in the event of a termination, for increased compensation for delivered units based on such added costs per unit. The claim, in other words, becomes one for termination damages arising from not being allowed to perform for the full two years in order to achieve lower costs per unit. Such termination damages are not an appropriate trust claim under the New York Lien Law by reason of the rationale of *Goldberger–Raabin*, 169 N.E. at 405. In any event, as discussed next, RBS is not liable for any damages arising from the termination.

Having determined what categories of claims may be asserted as New York Lienholder Claims, the court now turns to whether Bedford's claims are valid.

### IV

### ADDED CRANE COSTS ON TERMINATION

Bedford claims that by reason of the early termination of the Subcontract, Bed-

---

28. Bedford seeks, beyond its added labor costs incurred by reason of the delay, profit and overhead. If part of the allowable damages for delay, such profit and overhead are added costs of working on the improvement, and should be recoverable from the contractor trust. But whether such profit and overhead is allowable as part of the damages for delay is an entirely different question.

ford is owed costs it incurred of (1) $13,675.68 associated with disassembly and transportation of the cranes and (2) $90,835.00 associated with the early termination of Bedford's crane lease with United Rental Equipment Company, Inc. The court will disallow these claims. Even disregarding questions of whether such costs were proven, the claims must be disallowed: the New York Lien Law did not create an independent obligation to pay such costs, and the Subcontract did not provide for such costs.

## A.

Because of Aspen Knolls' payment defaults, RBS was forced to terminate the Aspen Knolls Contract on July 22, 1993.[29] On the next day, July 23, 1993, RBS sent a letter to Bedford to terminate the Bedford Subcontract, reciting Aspen Knolls' defaults as a force majeure necessitating ending Bedford's performance.[30] Bedford, in turn, was forced to return the cranes to its lessor at an earlier date than would have occurred had RBS not terminated the Subcontract. Bedford's crane lessor is demanding a higher monthly rental charge for the shortened period of Bedford's use of the cranes.

As part of its performance under the Subcontract, Bedford was to bear all costs associated with the cranes (dismantling, transportation to and from the job site, and rental). The Subcontract called for Bedford to erect 1,000 modular housing units at $4,380 per unit, for a total contract price of $4.38 million. Bedford maintains that, had the Subcontract not been terminated, (1) part of the cost of the labor and transportation for disassembly of the cranes from the Aspen Knolls project site [31] would have been allocable to units delivered after the termination date in July 1993,[32] and (2) it would have incurred crane rental at a monthly rate lower than the increased monthly rate (for the use of the cranes through July 1993) that its lessor is demanding based on Bedford's premature termination of the crane rental.[33]

---

29. *See* Sholos Dep. Ex. 5.

30. RBS sent a letter on that date to Bedford, stating:

> [P]ursuant to Section 26 of the Subcontract Agreement ... between RBS and Bedford, RBS hereby invokes the *force majeure* clause of the Agreement, as RBS has terminated the modular Units Purchase Agreement between RBS and Aspen Knolls.

Bedford concedes that this terminated the Bedford Subcontract. Tr. 7/27/98 at 14–15 (opening statement for Bedford).

31. This includes (i) labor and transportation expenses that Bedford paid the leasing company for disassembling the cranes and removing them and; (ii) costs that Bedford allegedly paid for union laborers who assisted the leasing company in disassembling the cranes.

32. But the amounts that Bedford claims for disassembling and transporting the cranes after termination of the Subcontract have not been prorated. Bedford has simply claimed the full amount of these charges even though, as it admitted, it would have incurred these charges had the Subcontract not been terminated early. In light of the court's determination, below, that no amount is recoverable, it is not necessary to calculate a proration of the charges.

33. In addition to rejecting Bedford's claim that RBS is responsible to pay for any increased rental rate Bedford incurred, the court alternatively finds that Bedford has not proven the amount by which it was damaged even if RBS would be liable for the increased cost. The $90,835 was a settlement demand made by the crane lessor. The court agrees with the Plan Committee that Bedford failed to show that this is the amount to which the crane lessor would be entitled based on a revised rate for a shortened period of leasing. A settlement demand is not evidence of what the prevailing weekly market rate is for a shorter lease period than was involved here. The Plan Committee additionally contends that the amount claimed exceeds the amount

### B.

■ Bedford invokes provisions of the New York Lien Law in support of these claims. For example, Bedford points to the New York Lien Law's definition of improvement as including "the reasonable rental value for the period of actual use of machinery ..." But, as already discussed, the New York Lien Law does not create claims which do not exist between the contracting parties. Rather, the statute contemplates that a claim exists and then asks whether the claim is of the requisite character (of being for performing work on an improvement) such as to be worthy of payment under the New York Lien Law. If no claim exists before examining the New York Lien Law, that statute does not impose a liability itself. Accordingly, if a contract provides that certain claims will not be owed, New York Lien Law does not override the contract.

### C.

So the first task is to examine whether either of these claims is owed under the Subcontract. The court concludes that these costs are not owed because the RBS–Bedford Subcontract permitted the debtor to terminate the Subcontract when it did, and because the Subcontract made no provision for any recovery of damages based on RBS's exercise of its right to terminate the Subcontract.

RBS properly terminated the Subcontract. The *force majeure* provisions of the Subcontract allowed RBS to terminate the Subcontract, on five-days written notice, if the Aspen Knolls Contract were terminated (or if various *force majeure* events occurred).[34] RBS properly terminated the Aspen Knolls Contract on July 22, 1993, and gave notice to Bedford on July 23, 1993 that it was invoking the *force majeure* provision of the Subcontract. The parties are in agreement that this terminated the Subcontract.

Once the Subcontract was terminated, this affected the amount of work for which Bedford was entitled to compensation: it was only entitled to compensation for units delivered prior to the termination of the Subcontract, for reasons that are explained below. The important point is that Bedford agreed to this compensation for undertaking its obligations under the Subcontract, with full awareness that the rightful termination of the Subcontract, whether because of an act of God or because of a proper termination of the Aspen Knolls Contract, would result in its not delivering as many units as it would if the Subcontract were not terminated. It did not bargain for compensation for lost profits it would have earned on additional units had the Subcontract not been terminated, nor did it bargain for compensation for having to spend more, per unit delivered, for crane rental and disassembling and transportation charges, than it would have expended had the Subcontract not been terminated.

---

that would have been owed had the cranes been used for the balance of the full period of the lease contracts.

**34.** Entitled "Force Majeure," § 26 of the RBS–Bedford Subcontract provided:

If Contractor's performance of its obligations under Contractor's Modular Units Purchase Agreement with Aspen Knolls Construction Corporation is prevented or delayed by reason of ... termination of Contractor's Agreement with Aspen Knolls Construction Corporation, then Contractor's payment and other obligations under this Subcontract Agreement shall be excused for so long as its performance is prevented or delayed.

. . .

If any such condition becomes permanent, [or] remains effective for more than sixty consecutive days ... Contractor can terminate this Subcontract Agreement by giving five days notice of said termination to Subcontractor.

### D.

The early termination of the contract was not a breach of contract giving rise to a right to damages. New York courts recognize that when a contract is terminated pursuant to its terms, the contract termination does not constitute a breach of contract. *Krim Cartage Co. v. Courier Servs., Inc.*, 52 A.D.2d 831, 384 N.Y.S.2d 164, 165 (1976); *Columbia Terrace Dev. Corp. v. Brown*, 153 A.D.2d 832, 545 N.Y.S.2d 579, 582 (1989)(a party "cannot be compelled … to respond in contract, tort or punitive damages due to its exercise of a contractually conferred right.").

The reasons why termination limited Bedford to compensation for units delivered prior to the termination of the Subcontract are these. First, § 2 of the Subcontract provided for payment on a monthly basis based on deliveries (1) for the first month of deliveries and (2) "for all subsequent months during the Contract Period." So the Subcontract contemplated that, after the first month, Bedford would be limited to payment for deliveries during the Contract Period.

Second, § 3 of the Subcontract provided:

The Contract Period of this Agreement shall begin immediately upon the signing of this Agreement and may end upon the earlier of the completion of the terms of the Contractor's [meaning RBS's] Agreement with Aspen Knolls Construction Corporation, termination of this Agreement by the Contractor, or upon a default, as more fully set forth herein.

This provision must be interpreted as providing for the Contract Period to be treated as ended upon a termination of the Subcontract. So, in conjunction with § 2, this provision limits Bedford to compensation for units delivered prior to the termination.

The use in § 3 of the word "may" instead of "shall" suggests that the ending of the Contract Period upon one of the listed events occurring was not automatic. In the case of a termination of the Subcontract, however, the obvious and straightforward interpretation of the Subcontract is that the ending of the Contract Period **was** automatic simply because there was no contract further to perform.

To explain the use of the word "may" requires a digression regarding ending of the Contract Period in the case of a default, but this digression also illustrates that the parties contemplated that an authorized termination of the Subcontract would limit Bedford's compensation to units delivered prior to the termination.

The word "may" was used because a default [35] would not necessarily end the Subcontract. A party, at its option, could elect not to treat the Subcontract ended (and the Contract Period thereby shortened) by reason of the other party's default. If, however, a party elected, at its option, to treat the Subcontract ended by reason of the other party's default, the Subcontract contemplated that the Contract Period would be shortened as a result of the default.

In the case of a default by RBS (defined by § 4 as a failure to make timely payment

---

**35.** Section 4 of the Subcontract defined a default by RBS as a failure to make payments in accordance with the Subcontract, such that Bedford could treat its obligations, and the Contract Period, as at an end if RBS failed to make payment. Section 4 defined default by Bedford as a material breach by Bedford of the agreement, Bedford's becoming insolvent, or RBS's reasonably adjudging "that [Bedford] was incapable of providing [RBS] with sufficient evidence that [Bedford] has the required number of vehicles, equipment and labor to perform its obligations under this Agreement."

to Bedford), Bedford's remedy under § 5(e)'s last paragraph was "to terminate this Agreement and collect monies earned by [Bedford] under this Agreement from deliveries that [RBS] has accepted but not yet paid for." Bedford's declaring the Subcontract terminated would have ended the Contract Period and the right of Bedford to deliver further units.

Upon a default by Bedford, RBS similarly had the right to declare the Subcontract terminated. Subcontract § 5(b). As in the case of a termination by Bedford, RBS would have no obligation to pay for any units delivered after the termination. If RBS did not terminate the Subcontract, however, the Contract Period would not be shortened by reason of the default.

This digression explains the use of the word "may" in § 3: not every default would necessarily result in a shortening of the Contract Period. But it also reinforces the implicitly obvious fact that if either party properly terminated the Subcontract, whether for default or some other reason, the Contract Period would be ended.

RBS terminated the Subcontract in July 1993, thus shortening the Contract Period that otherwise would have existed. The Subcontract then spelled out the consequences of the shortened Contract Period: Bedford would be entitled to compensation only for units delivered during the Contract Period.

### E.

Bedford can only point to the testimony of its expert witness that in New York, as a matter of custom and practice, a terminated subcontractor who, himself, did not create the conditions of the termination, even when the termination is pursuant to a *force majeure* provision, is entitled to his damages as a result of the termination. The expert testified that as matter of custom and practice, such a subcontractor should be placed in the condition he would have been in had he completed his contract. But he did **not** testify that if the contract specified the amount owed on a termination, custom and usage would override the parties' written agreement.

■ Here, the Subcontract specified the amounts to be paid to Bedford in the event of a termination, whether based on invocation of the *force majeure* provision or otherwise. This is thus not a contract for which resort to custom and usage is necessary in order to supply a term upon which the contract was silent. Custom and usage may not be applied to vary the clear and unambiguous terms of a contract. *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523 (2d Cir.1985); *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F.Supp. 401, 413 (S.D.N.Y. 1994).

■ Even if custom and usage could overcome a specific provision spelling out the compensation owed a subcontractor in the event of a termination for which the subcontractor bore no responsibility, the opinion the expert expressed was inadequate: without the contracts before the court that formed the basis for this opinion, the court cannot know whether those contracts included a provision that detailed, with as much specificity as the Subcontract here, the amount of compensation owed upon a termination.

Whatever rights Bedford would have had in the event RBS had breached the Subcontract by wrongly terminating the Subcontract, instead of terminating it of right, are simply irrelevant. The termination was neither caused by a breach by RBS nor constituted a breach by RBS.

By reason of the termination, Bedford was only entitled to compensation for units delivered prior to the end of the Contract

Period, not compensation for the increased expense per unit delivered.

## V

## REIMBURSABLE EXPENSE CLAIMS

 Based on an invoice dated July 26, 1993,[36] Bedford claims that it is owed $10,168.36 as a so-called Reimbursable Expense. This type of expense arose, for example, when repair work to a unit on the Aspen Knolls site was necessary to fix a defect that arose from a manufacturing error at RBS's plant or damage to a unit that had occurred during transit from RBS's plant to Staten Island. RBS would have Bedford's set crew employees do the repair work while the units were being put together. Bedford would, in turn, charge RBS for this additional work which had not been Bedford's responsibility under the Subcontract.

The Plan Committee disputes Bedford's entitlement to recover this particular Reimbursable Expense solely on the basis of inadequate proof. The Plan Committee urges that this particular invoice did not include the documentation that other Reimbursable Expense invoices included.[37]

There are three parts to this invoice: 46 hours of work, 71 hours of work, and 32 hours of work, all billed at the same rate, for an aggregate of 149 hours for $10,168.36. The court will allow all of this time except for 3 hours out of the 71–hour part of the invoice. So the court will reduce the $10,168.36 claimed by the $204.73 attributable to the disallowed 3 hours, resulting in a net allowance of $9,963.63.

### A. The 46 Hours

For most Reimbursable Expense work, a preprinted check list would be used to document the work. The check list included a left hand column for inserting the assigned number of the unit of the particular building. Preprinted in a row at the top were ten standard repairs (for example, "Remove Sheetrock on Gable," or "Closet Wall Under Stairs," or "Frame Valley"), with columnar boxes under each type of repair for Bedford to check off which repair or repairs were performed on each unit. RBS and Bedford agreed that RBS would pay for these at two man hours per deficiency repaired. RBS has not objected to other check lists such as this submitted for supporting invoices of Reimbursable Expenses.

Kane filled out one of these preprinted check lists to document 46 hours of such work (that is 23 deficiencies checked as repaired at 2 hours per deficiency) that he conducted in July 1993. William T. Knott, Jr. was RBS's project manager at the Aspen Knolls site, and had responsibility for passing on invoices (although this invoice was submitted after he had ceased working on the Aspen Knolls project). Knott conceded in his testimony that this check list was the type ordinarily used to provide backup for reimbursable expense invoices. These hours were adequately documented.

### B. The 71 Hours

Banks (Trial Tr. 7/27/98 at 86–87) testified that he prepared the invoice and attached page BC00650 of Ex. P which accounts for the charge for 71 hours. Banks testified that this 71 hours was computed on the basis of a daily report filled out by Kevin Kane or Paul Dean who were directing the labor. Kane testified that he per-

---

**36.** Bedford Ex. P, pp. BC 000649 through BC 000655.

**37.** Bedford's workers worked not only on RBS work when they were performing work outside the Subcontract, and, accordingly, accurate documentation was necessary.

formed this 71 hours of work based on a punch list given him by Ron Bodet of RBS. (Kane Tr. 200.) Kane kept the hours he spent on these jobs. The hours represent actual hours spent performing the work, not a presumed rate. (Kane Tr. 202.)

Of those 71 hours, 54 hours were for repairing shingles that buckled during alignment on 21 units.[38] Although Knott could not recall that many units having buckled shingles, he did not directly contradict Kane's testimony. Bodet (who worked under Knott) was the source of the punch list that led to Kane's performing the repairs. The units were identified by specific unit number, providing just as much detail as the check lists used for other more standard repairs. This 54 hours was adequately documented and substantiated.

Of the 71 hours, an additional 14 hours was for repairing skylights and aluminum that were leaking on two units (3 hours), adding shingles to one unit (2 hours), and repairing the drip cap on four buildings (9 hours). Although Knott could not recall the work being necessary, or RBS's having requested the work to be done, he did not contradict Kane's testimony. Moreover, Bodet (who worked under Knott) was the individual who asked Kane to perform the work. This additional 14 hours was adequately documented.

Of the 71 hours, RBS does dispute its responsibility for the remaining 3 hours which were charged for fixing siding on four units. Kane himself acknowledged that siding was the responsibility of another subcontractor of Aspen Knolls. RBS had no responsibility for the siding work, which was Aspen Knolls' responsibility. The court will thus disallow these 3 hours.

So all but 3 hours of the 71 hours is allowed.

### C. The 32 Hours

The 32 hours of Reimbursable Expenses was for "sheetrocking mate walls in attics," listed on a summary sheet for Reimbursable Expenses for July 1993 performed on buildings # 29 and # 9 (which also included the 46 hours from the "check list").[39]

Towards the end of the job, Bill Knott of RBS asked Kane to do this work. Kane testified that this was the only time that Kane did such work. Given the passage of time, it is not surprising that he did not recall that on May 24, 1993, Kane sheetrocked mate walls in the attics of back to back units in Building # 21, charging for 2 carpenters for 16 hours. The Plan Committee paid for this 16 hours of work, which was part of a June 1, 1993 invoice [40] for $13,261.70, as part of the $718,128.83 payment of "Amounts Undisputed By the Committee." [41] Knott conceded that this was a type of work that Bedford did for RBS, and conceded that the 32 hours charged for July 1993 could have been

---

**38.** This arose because of the way the unit's third floor box was constructed such that it was not a hundred percent flush with the box below. (Kane Tr. 201.) The box had to be shifted around in order to square it with the second floor box below, and in the process, the shingles buckled. RBS has not questioned its liability for any work that was actually done repairing buckled shingles. (Kane Tr. 201.)

**39.** Kane explained these 32 hours of mate wall repairs as follows. A mate wall was where the two boxes came together to form one unit. There was a gap, say an inch or an inch and a half all the way through where these boxes would meet. Kane sheetrocked the gap in the attic with fireproofing material to prevent any fire from passing through the gap to another unit.

**40.** The invoice is part of Bedford Ex. P.

**41.** See Ex. A to Plan Committee's Memorandum filed Nov. 24, 1998.

done either before or after he left toward the end of July 1993.

Knott testified that the backup for the invoice, as a whole, lacked adequate documentation. But he did not specify what part was inadequate. Here, the invoice identified the two buildings for which Reimbursable Expense work was done in July 1993 (without indicating whether the mate wall work was done on one of the buildings or both, in contrast to the June 1 invoice which specified the actual building in which the mate wall work was done). RBS presented no witness to rebut Kane's testimony that Bedford (through Kane's company) performed this work. Although Kane lacked credibility on other matters (related to delay claims instead of these claim), and although somewhat greater detail would have been desirable, Kane's testimony and the invoice detail suffices to carry Bedford's burden of proof. Knott's responsibilities included passing on invoices submitted by Bedford, but he did not check invoices after he was off the job at the end of July 1993. Knott was gone from the job by the time that the work was invoiced and did not have an opportunity to check the invoice against his records. Accordingly, the 32 hours was adequately documented.

Accordingly, Bedford is entitled to recover a total of $9,963.63 on its Reimbursable Expense claims.

## VI

## CLAIMS FOR FIRST FLOOR SET (PARTIAL COMPLETION)

The Subcontract called for Bedford to be paid only when it had delivered a unit. But the Plan Committee recognizes that, although the contract was terminated, it would not be fair to deprive Bedford of compensation for units partially delivered.

Bedford claimed that it was entitled to $89,352.00 for partially completing 51 units by performing on those units the first floor set work—also known as the panel work because only the first floor involved panels.[42] The Plan Committee paid $48,880.00 of this claim and disputes the $40,472.00 remainder of the claim.

First, there is a dispute as to how many units were set. The court finds that 47 units had first floor set work (and only first floor set work) completed, not the 51 units claimed by Bedford. According to RBS records, only 47 units had only the first floor set. Specifically, 51 units were manufactured for deliveries to the staging area that commenced on June 21, 1993, but four out of those 51 units never had first floor set work performed.[43] Bedford produced no exhibit showing that it had completed first floor set work on 51 units. Indeed, Bedford's own records[44] showed that on and after June 21, 1993 (the earliest date of RBS's delivery of any of the 51 units) Bedford set panels on only 47 units.[45]

---

42. The second and third floors involved boxes.

43. As reflected by the last page of Plan Committee Exhibit 8, first floor set work ("Panels Only") was performed ("Unit Set") on only 47 units. A 48th unit had a date of Unit Delivery by RBS to the staging area of July 14, 1993, but the Unit Set Date is blank. Three other units had been manufactured, and apparently were in the midst of being shipped, and thus had no date listed for Unit Delivery by RBS to

the staging area. A 52nd unit had been manufactured but was apparently not yet ready for shipping.

44. Bedford Ex. V (last two pages).

45. The same exhibit shows that only 30 units had panels set in July 1993, no more than the Plan Committee's exhibit shows as set in July 1993. The last page of Plan Committee Exhibit 8 shows that 31 units had panels set in July 1993. The one unit difference could be

Banks testified that he did a visual count and that he believes there were 51 first floor units that were completed, first floor only.[46] This, intentionally or not, was equivocal testimony: Banks seems to be saying that he believes he came up with 51 units, but he is not definitive on the point. He wrote a letter on July 23, 1993, requesting payment for 51 units, but did not detail which units he believed were completed, and Banks failed to testify that the 51–unit figure used in the letter was based on his visual count (which may have been conducted after he wrote the letter). He may have used the 51–unit figure based on the 51 units that RBS had manufactured and had either already delivered or was in the process of shipping. Bedford made no effort to have Banks explain why Bedford had no records showing 51 units instead of 47 units, or why RBS's and Bedford's own records would both fail to take account of 51 units that Bedford argues that Banks actually visually counted.

█ Second, there is a dispute regarding the appropriate amount to be charged for each first floor set. The court fixes this at 29.76% of the average contract price per unit of $4,360.00. Bedford used what Banks frankly admitted was only an estimate of the contract costs and profit allocable for doing first floor set work. Banks estimated that 40% of the average contract price for completed units was attributable to the first floor set work.[47] He then multiplied 51 units times 40% of $4,380 (the average he erroneously used as owed per fully completed unit versus the $4,360.00 actual average) to arrive at $89,352.00.

The Plan Committee disputes the accuracy of Banks' estimate of 40%. Banks' estimate is not in accord with Bedford's bid for the work in January 1992 which shows that only 29.76% of the work on completed units was attributable, on average, to the first floor work.[48] That bid was, of course, prior to Bedford having any actual experience with constructing units, but that earlier estimate was also not made for purposes of seeking compensation for only doing first floor set work. Banks would have been subjectively motivated to estimate the percentage on the high side in seeking such compensation. So on a completed unit basis, using Bedford's original bid, the first floor set represented 29.76% of the direct work on a unit and the direct work on the rest of the unit, on average, represented 70.24% of the work on the unit. That is what was contemplated in the contract negotiations, at a

---

attributable to RBS's sometimes not marking panels as set until one or more days after the panels were actually set, so that one panel actually set in June 1993 was marked by RBS as set in July 1993.

**46.** Trial Tr. (Banks) (7/27/98) at p. 205.

**47.** The first floor set work did not vary according to the size of a unit, whereas second and third floor work did. So it is not necessary to know how large the units were upon which first floor set work was done.

**48.** Bedford bid only $1,040.00 for each first floor set and $2,455.00 for the rest of each unit (a total of $3,495.00) before adding on other costs to arrive at an average bid price per completed unit of $4,380.00. The final contract was for a price of $4,360,000.00, so that the average price per completed unit became $4,360.00 instead of the $4,380.00 originally bid.

In other words, Bedford bid $3,495,000.00 for the work on the first, second, and third floors of the units but the total bid for 1,000 completed units was $4,380,000.00. To arrive at the total bid, there was added to the $3,495,000.00, first, Bedford's estimate of $750,000.00 for other costs (staging, security, trucking, and delivery from the job gate to the working site) and, second, $135,000.00 for bond costs and additional profit. The $4,380,000.00 figure was later reduced by $20,000.00 in arriving at the contract price of $4,360,000.00.

time when neither party foresaw the issue of determining the appropriate compensation for only first floor set work.

The court believes this 29.76% is the more appropriate percentage. Banks felt that 40% was more appropriate because his experience on the job showed that Bedford was not quite as productive as it had anticipated, such that the costs for the first floor set were actually higher. But he did not testify whether Bedford had also proven less productive on the second and third floor sets. He apparently went through a review of the components of labor and equipment used in performing work on the first floor set, but we do not know how thorough that review was. Moreover, there is no indication that he did a similar review for the labor and equipment components of the work performed on the second and third floor work.[49] Without a review of second and third floor costs, the court cannot accept Banks' 40% figure.[50]

Accordingly, the court will utilize the 29.76% figure and multiply it times 47 units at an average contract price of $4,360.00 per unit. This results in appropriate compensation of $60,984.19 for first floor set work instead of the $48,880.00 paid by the Plan Committee. Accordingly, Bedford is entitled to recover an additional $12,104.19 for such work.

## VII

## DELAY CLAIMS

Bedford seeks to recover damages for idled labor and equipment. The Plan Committee challenges the Delay Claims on several grounds. Except for one delay claim for which RBS received reimbursement from Aspen Knolls, the court will reject Bedford's delay damage claim, but not for all the reasons advanced by the Plan Committee. The court's disposition (or, in some instances, partial disposition) of the issues is as follows. First, the terms of the Bedford Subcontract did not bar Bedford from recovering delay damages. (Part A, below.)

Second, Bedford did not waive the delay claims by failing to let RBS know that it viewed time as of the essence. (Part B, below.)

Third, nevertheless, RBS was not responsible for the delays, the suspension of work having been occasioned, as Bedford was well aware, by the serious payment defaults of Aspen Knolls to RBS, defaults which as a matter of law justified RBS's suspension of work on the project, and thus RBS is not liable for Bedford's delay damages. (Part C, below.)

Fourth, RBS never admitted that it was liable for delay damages, but it did agree to pay delay damages to the extent that Aspen Knolls reimbursed RBS for the payment. (Part D, below.)

Fifth, custom and usage in New York City construction industry cannot overcome the rule that RBS is not liable for damages for delay that RBS failed to cause. (Part E, below.)

49. Banks did not testify to a detailed evaluation of the respective costs of equipment or labor on the two different parts of a unit (the first floor set work and the second and third floor work). Both the amount of time of utilization of such items and the rate of such utilization would have to be considered as to both parts. For example, the second and third stories required use of the larger crane—the so-called crawler crane or lattice crane. According to Bedford's own calcula-

tion, this larger crane's cost was $800 daily, twice as expensive as the hydraulic crane cost of $400 daily that was used in the first floor set work. *See* Bedford Ex. I. And the larger crane entailed assembly and disassembly costs, and the transportation costs of the larger crane were significantly greater.

50. *See* Trial Tr. (Epstein) (8/6/98) at p. 152 line 18 to p. 153 line 2.

Sixth, RBS did not make a recovery from Aspen Knolls for damages suffered by Bedford. (Part F, below.)

Seventh, even if Bedford could recover delay damages from RBS, Bedford's delay claims are overstated and in large part insufficiently proven. (Part G, below.)

### A.

### *The Bedford Subcontract does not bar Bedford from recovering delay damages.*

█ The Plan Committee urges that the Subcontract itself bars Bedford from recovering delay damages. The court rejects that argument. Because the court rules in part C below, that RBS is not responsible for the delay damages, and because the question is purely one of law that an appellate court can review de novo, the court will not discuss this issue at great length.

### 1.

First, RBS had an obligation to deliver a certain quantity of units to Bedford each month. The Subcontract provided:

> **Subcontractor acknowledges that it has seen a copy of the delivery schedule appended hereto as Exhibit B,** and incorporated by reference herein, and Subcontractor recognizes that Contractor has specific delivery obligations to Aspen Knolls Construction Corporation. Subcontractor further recognizes and agrees that **Contractor may increase or decrease the number of units to be delivered in any given month during**

**the Contract Period by a maximum of ten units.**

Subcontract at § II(3) (emphasis added).

RBS thus acknowledged that it would provide Bedford with sufficient manufactured units to enable Bedford to make deliveries of no fewer than 10 less than the amount of units set forth on the delivery schedule. When RBS failed to deliver the number of required units to Bedford during Bedford's performance of the Subcontract, this delayed Bedford in its ability to perform, and necessitated Bedford to bear certain expenses—idled labor and equipment—that would otherwise have been devoted to productive work. Unless RBS's failure was not its fault, the failure would subject RBS to recovery of the damages that Bedford suffered on account of the delay. *Norcross v. Wills,* 198 N.Y. 336, 91 N.E. 803 (1910). RBS was plainly justified in suspending performance based on the substantial defaults in payments that existed at the time of each suspension of work. Whether that suspension of work can be deemed to have been caused by Aspen Knolls is the critical question addressed later.

### 2.

However, Bedford also acknowledged that "Subcontractor is aware of Contractor's obligations under [the] Agreement" with Aspen Knolls. Two aspects of that latter contract warrant mention.

First, under the Agreement, the delivery schedule could be modified by Aspen Knolls and RBS.[51] Banks participated in meetings in which the delivery schedule

---

**51.** The Aspen Knolls Contract required the parties each month to agree in writing to "the quantities of the individual types of Units to be delivered each week during each such succeeding three-month period." Agreement at 8. But if Aspen Knolls failed to take delivery of the minimum quarterly number of units required to be delivered under the original delivery schedule, Aspen Knolls was obligated to pay RBS, for each such unit not delivered in the quarter, 5% of the total purchase price of the unit. This was obviously designed to protect RBS from damages it might suffer by reason of delays disrupting the manufacturing process.

was modified. But this is immaterial. Bedford plainly bid on the original delivery schedule being adhered to by plus or minus 10 units.

Second, the Aspen Knolls Contract provided that RBS could suspend work in the event of a default, defined as a material breach, that is, a breach that materially affected or seriously impaired the ability of RBS to perform its obligations under the agreement. Aspen Knolls' failure to make substantial payments to RBS plainly constituted a default.

### 3.

 The Plan Committee argues that the Subcontract excluded delay damages as a remedy even if RBS was the party whose fault caused the delay, but is unable to point to a provision that expressly states that there are to be "no damages for delay." Instead, it points to a more general provision. When a contract contains a "no damages for delay" clause, such clauses "must be construed strictly against the party seeking exemption from liability resulting from his own fault." *Port Chester Elec. Constr. Corp. v. HBE Corp.*, 894 F.2d 47, 48 (2d Cir.1990) (applying New York law) (citations omitted). Applying that standard here, the provision the Plan Committee invokes fails clearly and unambiguously to prohibit delay damages, and its argument must thus fail. *Port Chester*, 894 F.2d at 48.

The Plan Committee invokes Subcontract § II(5)(e) which provided:

> Should Contractor [RBS] default hereunder, Subcontractor's **sole remedy** shall be to terminate this Agreement and collect monies earned by Subcontractor under this Agreement from de-

liveries that Contractor has accepted but not yet paid for.

This provision, however, must not be read in isolation. Subcontract § I(8) provided:

> A default of this Agreement is defined as either a material breach of this Agreement by either party or upon the Subcontractor's insolvency . . . .

In turn, Subcontract § I(9) provided, with respect to obligations of RBS,[52] that:

> A material breach of this Agreement by the Contractor may occur should Contractor not pay Subcontractor for units delivered and accepted by Contractor.

This provision cannot reasonably be read as restricting what may otherwise qualify as a material breach (and hence a default) which can justify termination of the Subcontract. For example, if RBS physically barred Bedford from the staging area, thus preventing Bedford's performance, Bedford would be fully justified in treating this as a material breach authorizing it to terminate the Subcontract. Other breaches, however, might not be sufficient to rise to the level of a material breach constituting grounds for termination.

In turn, Subcontract § II(4) provided:

> Contractor shall be in default of this Agreement should Contractor fail to make payments to Subcontractor in accordance with this Agreement.

This provision might be redundant, because failure to make payments is already described as something that **may** be treated as a material breach and hence a default. But the provision might be intended to provide that a failure to make payments **shall** be treated as a default—not as a

---

52. The Plan Committee correctly conceded in closing argument that the provision in Subcontract § I(9) that "[f]ailure to timely deliver the required number of units in any given month during the Contract Period constitutes

a material breach of this Agreement" has reference only to Bedford's delivery obligations. Delivery was a defined term referring to Bedford's part of the job. Subcontract § I(5).

breach short of a default—so that the remedy for such a failure is limited by Subcontract § II(5)(e) to termination of the Subcontract and recovery only of payments owed for units completed. Alternatively, it could be read as providing that such a breach **shall** at Bedford's option be treated as a default allowing Bedford to terminate the Subcontract, albeit with its damages limited by § II(5)(e).

The court believes this provision must be read as providing nothing more than that if RBS breaches the Subcontract, and if the breach is treated by Bedford as material, then Bedford may not recover damages for the part of the Subcontract it was not allowed to perform after the date of termination.

The term "material breach" is a well established term in contract law. As stated in *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, 90 F.Supp.2d 401, 410 n. 33 (S.D.N.Y.2000) (applying New York law) "[a] material breach is defined as one that is 'significant enough to amount to the nonoccurrence of a constructive condition of exchange' " (quoting 2 FARNSWORTH § 8.16). Thus, a material breach is one that justifies termination of the contract. Furthermore, a partial breach, a breach that is not treated by the injured party as material breach, nevertheless gives rise to a claim for damages:

> As a general rule, every breach of contract gives rise to a claim for damages. If the breach is **material** and the breaching party fails to cure the breach within a reasonable period of time, the aggrieved part can elect to terminate the contract and claim damages for **total breach**. . . .

In contrast, if the breach is not material or if the party aggrieved by a material breach elects not to terminate, the breach is deemed **partial**, and the contract remains in force. In consequence,

only those claims arising out of the partial breach accrue at that time.

*Cary Oil*, 90 F.Supp.2d at 408–409 (footnotes omitted and emphasis added). So if RBS's failure to ship sufficient units was a breach, Bedford could elect, as it did, to treat the breach as a partial breach.

If a breach was sufficiently adverse, Bedford could elect to treat the breach as a material breach, and hence a "default" (the same thing as a "total breach" in the case law) justifying termination of the Subcontract. Plainly what RBS was attempting to accomplish was to prevent Bedford from suing it for lost profits if a material breach by RBS led to Bedford's declaring a default and terminating the Subcontract.

Accordingly, the court concludes that Subcontract § II(5)(e) did not bar Bedford from recovering delay damages for any breach which it elected not to invoke as a default to terminate the Subcontract.

### B.

*Bedford did not waive its delay claims by failing to let RBS know that it viewed time as of the essence.*

The Plan Committee asserts that in order to determine that a project has been delayed, it must first be established that time was of the essence to the contract, citing *Ring 57 Corp. v. Litt*, 28 A.D.2d 548, 280 N.Y.S.2d 330 (1967), as standing for the proposition that where time was not of the essence to the contract, there was no default and no basis for a delay claim.

But *Litt* was a real estate contract case, and time is generally never of the essence in such cases unless the contract specifically provides for time to be of the essence. *Whitney v. Perry*, 208 A.D.2d 1025, 617 N.Y.S.2d 395 (1994). In other cases, "[i]f by the contract itself the date of performance is fixed, then time is

essential, and failure to perform on the day indicated is ground for a recission." *John F. Trainor Co. v. G. Amsinck & Co., Inc.,* 236 N.Y. 392, 140 N.E. 931 (1923) (citation omitted).

Moreover, *Litt* did not involve a damage claim for delay: at issue was whether a default could be declared to terminate the contract. That is the sense in which decisions speak of time as being of the essence, that is, as sufficient to justify termination of the contract. When it comes to the question of damages, breach of a delivery schedule is a basis for recovering damages even if time was waived as being of the essence such as to warrant termination. As stated in *General Supply & Constr. Co. v. Goelet,* 241 N.Y. 28, 148 N.E. 778 (1925):

> The owner thereby waived time as an essential element of the contract; but nonetheless the failure to complete at the time fixed in the contract constitutes a breach and gives rise to a cause of action for **damages** caused by the delay.

*See also Crocker–Wheeler Co. v. Varick Realty Co.,* 43 Misc. 645, 104 A.D. 568, 88 N.Y.S. 412, 413 (Sup.Ct.1904).[53]

### C.

*The suspension of work having been occasioned, as Bedford was well aware, by the serious payment defaults of Aspen Knolls, RBS is not liable for Bedford's delay claims.*

■ Bedford is barred from recovering delay damages because the cause of the delay was Aspen Knolls' failure to pay RBS, thus causing RBS cash flow problems and necessitating RBS's suspending work on the project, as was its right under the Aspen Knolls contract. This is a troubling outcome in light of Bedford's lack of privity with Aspen Knolls entitling it to sue Aspen Knolls for causing the damage. But the law is clear that if the owner is the cause of the delay, the contractor is not liable for the subcontractor's delay damages unless the contractor expressly agrees to be liable for such damages.

### 1.

In *Triangle Sheet Metal Works, Inc. v. James H. Merritt, Co.,* 79 N.Y.2d 801, 580 N.Y.S.2d 171, 588 N.E.2d 69 (1991), the court stated the rule that:

> Absent a contractual commitment to the contrary, a prime contractor is not responsible for delays that its subcontractor may incur unless those delays are caused by some agency or circumstance under the prime contractor's direction and control. Contrary to Triangle's contention, there is no basis for concluding that a prime contractor—which oftentimes lacks control over much of the work to be performed at a particular project—has implicitly agreed to assume responsibility for all delays that a subcontractor might experience—no matter what their cause. If a subcontractor wants a prime contractor to be a guar-

---

**53.** As stated by the court there, 88 N.Y.S. at 413 (citations omitted):

The plaintiff, for reasons which constitute no excuse, did not comply with its contract as to time, and did not complete either elevator until March 2d. Notwithstanding plaintiff's failure to complete its contract on time, the defendant did not exercise its right to terminate the contract for this reason, but permitted plaintiff to go on and complete the work.... The defendant thereby waived any right it might have asserted to plead the delay as a defense to an action for the agreed price. It did not, however, thereby waive its right to counterclaim for any actual damage it might have suffered by reason of the delay. Unless, therefore, the defendant in some way waived its claim for damages, it is still in a position to recover them..... [T]he mere forbearance to insist upon a forfeiture did not constitute a waiver.

antor of job performance, it should bargain for the inclusion in its subcontract for a provision to that effect.

*Triangle,* 588 N.E.2d at 70 [citations and quotation omitted].

Bedford did not obtain a guarantee from RBS that RBS would be responsible for delay damages suffered by Bedford when the cause of the delay was the fault of the owner, Aspen Knolls. Had Aspen Knolls physically barred RBS from entering the staging area to ship in manufactured units, the resultant damages for delay in Bedford's receiving units to erect could not properly be charged to RBS. Although Aspen Knolls did not physically bar RBS from performing, it did the next worst thing by failing to pay RBS substantial payments as they came due.

■ Aspen Knolls's wrongful breach of its payment obligations to RBS was the cause of RBS's suspension of the work. As an experienced contractor, Bedford was well aware that if RBS did not get paid as required by the Aspen Knolls Contract, this could cause a suspension of deliveries by RBS. (Bedford itself had suspended performance on its direct contracts with Aspen Knolls based on delayed payments.) As observed in *Goldberg v. E.W. Tompkins Co. (In re U.S. Air Duct Corp.),* 38 B.R. 1008 (N.D.N.Y.1984) (applying New York law):

> Where, as here, failure to make agreed upon progress payments prevents performance by the [contractor], it is a material breach that justifies suspension of performance by the [contractor]. *Guerini Stone Co. v. P.J. Carlin Constr. Co.,* 248 U.S. 334, 345, 39 S.Ct. 102, 106, 63 L.Ed. 275 (1918).

New York law thus recognizes that nonpayment by the owner is the causative event when performance is suspended due to the cash flow problems engendered by nonpayment. Here, RBS never guaranteed that even if Aspen Knolls failed to make payments, there would be no suspension of work. The Bedford Subcontract was written against the background that a payment default by Aspen Knolls would, if it impaired RBS's ability to perform, lead to suspension of the manufacture, shipment, and erection of modular units that RBS had committed to make, and the erection of which it had hired Bedford to perform. Aspen Knolls' breach of its payment obligations caused the suspension of deliveries and thus was the cause of the delays. Aspen Knolls was the party at fault, not RBS. Like Bedford, RBS was a victim. Under *Triangle,* Bedford can not recover from RBS because the delay was caused by Aspen Knolls, not RBS.

2.

RBS acted reasonably. RBS kept Bedford informed of Aspen Knolls' funding difficulties. Moreover, Bedford was aware that Aspen Knolls was having funding problems because Bedford itself suffered delays in payment on contracts it had directly with Aspen Knolls.

Once it suspended shipments, RBS did so reasonably. The Aspen Knolls Contract called for $43.0 million to be paid RBS for delivery of 1,000 units over a two-year period, and required Aspen Knolls timely to pay invoices for units that were delivered. On October 22, 1992, when RBS first stopped delivery of modular units to the Aspen Knolls site (the first shutdown), Aspen Knolls was in default for two invoices for which it owed RBS more than $3.0 million ($638,484.63 remaining unpaid on the one invoice, and $2,446,889.91 unpaid on the second invoice). This was no minor default: it severely hampered RBS's cash flow and fully

justified RBS's suspension of work.[54]

By December 9, 1992, Aspen Knolls had paid RBS approximately $1.8 million of the invoices due at the time of the first shutdown. Five days later, on December 14, 1992, RBS resumed its delivery of units to the Aspen Knolls site.

When no further payment was received, RBS again suspended delivery of modular units on January 8, 1993 (the second shutdown). A payment of approximately $3.65 million was received by RBS from Aspen Knolls on January 29, 1993, and on February 10, 1993, RBS resumed delivery of modular units to the Aspen Knolls site.

On July 22, 1993, when RBS terminated the Aspen Knolls Contract, Aspen Knolls owed RBS $3,229,577 for two invoices.

### 3.

To treat RBS as the cause of the delay would blink reality. RBS was owed millions of dollars by Aspen Knolls, and given the uncertainty of payment could not reasonably be expected to continue performance on the project, even if it had sufficient cash flow otherwise. In any event, because of Aspen Knolls' substantial payment defaults, RBS did not have sufficient cash flow, and Aspen Knolls' default thus necessitated the shutdowns and caused the delays. In a conversation with William Knott (RBS's construction foreman), Bedford's Banks himself viewed Aspen Knolls's default as causing harm to both RBS and Bedford. That Aspen Knolls should be treated as the cause of the delay is reinforced by a provision of the Subcontract regarding inability of RBS to obtain materials or labor. The Subcontract recognized that RBS would be excused from performance due to "inability to obtain labor and/or materials beyond the control of Contractor." Subcontract § II(26). Although that provision would typically cover unavailability of materials and labor due to market shortages, Bedford acknowledged that disruptions in RBS's ability to obtain materials and labor based on events beyond RBS's control would excuse performance. In the context of who caused the delays, Aspen Knolls' payment defaults resulted in RBS having insufficient cash flow to continue to pay for labor and materials, resulting in an inability to obtain materials and labor (based on insufficient funds to pay for them), an inability just as much beyond RBS's control as an inability caused by market shortages.

### 4.

The court rejects Bedford's contention that RBS was undercapitalized and thus is the real party who caused the delays by failing to continue to expend funds to perform despite Aspen Knolls' failure to make payments to RBS. There is no evidence that RBS was insufficiently capitalized to perform its delivery obligations to Aspen Knolls had Aspen Knolls made payments reasonably on schedule. RBS made no commitment to Bedford that it would not suspend shipments if Aspen Knolls failed to pay RBS. Bedford extends this argument further by pointing to the analogy of a tenant who begs forgiveness from paying rent on time because his clients are not paying him on time. But that analogy concerns a payment obligation, not the question of who, in the performance of construction contracts— the owner, the contractor, the subcontractor, or other subcontractors—should be treated as in the wrong and the cause of a delay arising from causes other than outside forces. Here, the Subcontract acknowledged the existence of the Aspen

---

**54.** Aspen Knolls and RBS agreed to the suspension without the necessity of RBS issuing a formal notice of default.

Knolls Contract, and RBS's delivery obligations under that contract. Under *Triangle,* a contractor is not the guarantor to the subcontractor that the delivery schedule promised to the subcontractor will be adhered to even when the owner prevents the contractor's performance by a failure to make timely payments for completed units.

### 5.

RBS fairly apprised Bedford that RBS was not the cause of the delays and hence not responsible for paying Bedford's delay damages.

On January 15, 1993, in the midst of the second shutdown, Banks transmitted a fax dated January 14, 1993, to Keith Sholos, the president of RBS, to confirm a conversation in which Bedford acknowledged that it would keep its equipment and men on site until it heard further from RBS by January 22, 1993. Apparently recognizing that the delays were caused by Aspen Knolls, such that RBS's liability for delay damages was in doubt, he attempted to obtain an agreement from RBS to reimburse Bedford's delay damages by stating, "RBS agrees to reimburse Bedford for labor and equipment rentals and all incurred costs directly related to this delay." Sholos replied on January 19, 1993:

> [W]e did not discuss who would be responsible for the cost of the current shutdown. Furthermore, I did not agree that RBS would absorb these costs. I believe the current delays are not the responsibility of RBS.
>
> By way of this letter I am informing Aspen Knolls Corporation of your request for reimbursement of additional costs due to on-site delays.

By invoices dated December 31, 1992, and January 26, 1993, Bedford sent RBS its Delay Claim # 1 for the period of October 26, 1992, through December 15, 1992. By a letter of February 11, 1993, Sholos responded:

> At no time · . . . did RBS agree verbally and or in writing to absorb these delay costs. However, I will forward your charges on to the owner of the project, Aspen Knolls Development Corporation, in hopes that they will recognize the cost of these unforeseen delays that were imposed on Bedford Construction Corporation and Regional Building Systems, Inc. through no part of our own. I do not represent, nor do I assure you, that these payments will be forthcoming from the owner **nor does RBS accept responsibility for reimbursement of these delay claims or any other subsequent claims associated with the funding delays on the project.**
>
> . . .
>
> I regret that the delays in this project have cost you additional funds; however, RBS has incurred expenses far in excess of yours and I must reiterate once again that we are not responsible nor liable for these delay claims.

[Emphasis added.] In a letter dated February 15, 1993, Sholos repeated that Bedford's delay claims were "due to delays onsite **beyond our control.**" [Emphasis added.] Bedford can thus not claim that it was misled by RBS as to the cause of the delay.

### 6.

RBS and Bedford were in the same boat: they had to decide whether to continue performance in a suspended mode, each suffering damages based on the delayed funding of the project by Aspen Knolls, but each hoping to realize the fruits of a completed Aspen Knolls project. Bedford failed to take steps to protect itself in the event that RBS proved right that Aspen Knolls was the cause of the delay. It made no effort to secure the

right to sue Aspen Knolls for its delay damages.

The court assumes that Bedford had no agreement with Aspen Knolls that would have permitted it to sue for such damages. Nevertheless, as a condition to Bedford's staying on the job and suffering delay damages, Bedford could have requested RBS to agree to collect (at Bedford's expense) Bedford's delay damages from Aspen Knolls. Bedford failed to do so.[55] Had such a request been made and refused by RBS, the refusal by RBS would have been a breach of RBS's obligation of good faith given its commitment to keep a set level of units shipped for erection by Bedford. Such a breach would have subjected RBS to claims by Bedford based on breach of that obligation.

■ In New York, in order to avoid the privity rule that might bar the subcontractor suing the owner for delay damages, a subcontractor and a contractor can enter into a "pass through" agreement whereby the subcontractor's delay damages caused by an owner can be recovered by the contractor on behalf of the subcontractor. As stated in *Schiavone Constr. Co., Inc. v. Triborough Bridge & Tunnel Auth'y*, 209 A.D.2d 598, 619 N.Y.S.2d 117 (1994):

> The courts of this state have consistently held that a prime contractor to a construction contract may prosecute a claim against the owner for the benefit of the injured subcontractor. Thus, a prime contractor and its subcontractor may agree, either in the subcontract or in a liquidating agreement, that the prime contractor will sue the owner on behalf of the subcontractor and turn over any sums recovered to the subcon-

tractor in satisfaction of the subcontractor's claim.

*Schiavone*, 619 N.Y.S.2d at 118 [citations omitted].

■ Moreover, in appropriate circumstances, "the assertion of a claim by the subcontractor against the prime contractor is not a condition precedent to the prime contractor's action against the owner based upon a pass through claim." *Schiavone*, 619 N.Y.S.2d at 118 [citation omitted]. Indeed, refraining from suing the contractor—even though the cause of action would be unsuccessful under *Triangle*—is the typical form of consideration for these type of agreements. *Barry, Bette & Led Duke, Inc. v. State*, 169 Misc.2d 594, 645 N.Y.S.2d 713, 720 (N.Y.Ct.Cl.1996). Such a "pass through" agreement can provide for the subcontractor to bear the cost of and assume the control of the litigation, and provide for the subcontractor to sue in the name of the contractor. *Barry, Bette & Led Duke*, 645 N.Y.S.2d at 717. Given Bedford's litigation against RBS for its delay damages, there can be little doubt that RBS would have been wise to enter into such a "pass through" agreement had Bedford requested it. But Bedford never requested such an agreement.

At best, it obtained a conditional agreement by RBS, namely, as noted above, that RBS would request Aspen Knolls to pay the delay damages, implicitly promising to pay Bedford the delay damages if Aspen Knolls honored the request. RBS lived up to its promise to request Aspen Knolls to pay for Bedford's delay damages. In what appears to be February 1993, RBS sent an invoice to Aspen Knolls re-

---

**55.** Instead, as already discussed in part 4, above, Bedford attempted to secure an agreement from RBS for RBS to be directly liable for the delay damages, but that was refused. Nevertheless, Bedford elected to continue to perform even though RBS was taking the position that Aspen Knolls' payment delays, not any action by RBS, was the cause of the delay.

questing payment of penalties, late charges, and attorney's fees, plus delay damages suffered by then by Bedford totaling $157,309.50. RBS made a later request to Aspen Knolls for payment of Delay Claim No. 3 in September 1993 (and that request is discussed in part D, below).

### D.

*RBS never admitted it was liable for Bedford's delay damages.*

 In September 1993, RBS requested sufficient funds from Aspen Knolls to make payments to subcontractors, including a payment to Bedford for $860,987.68 documented by Bedford. In anticipation of Aspen Knolls supplying the necessary funds, RBS's Sholos issued a letter authorizing Knott to sign checks to the subcontractors, and sent a copy of this letter to each of the subcontractors. Because Bedford's documentation for enabling RBS to request the funds from Aspen Knolls included Delay Claim No. 3 in the amount of $170,402.68, Bedford asserts that RBS admitted that it was liable for Bedford's delay damages.

But it is clear that RBS was simply "passing through" Bedford's claims for payment by Aspen Knolls, to be disbursed by RBS, and, accordingly, was not acknowledging that RBS was recognizing that RBS itself was liable to Bedford for delay claims. This is consistent with the whole tenor of prior discussions between RBS and Bedford discussed above: RBS had agreed to relay delay claims to Aspen Knolls to see if Aspen Knolls would pay them, but affirmatively stated that RBS

was not acknowledging any responsibility for the delay damages.

To elaborate, the $860,987.68 request arose as follows. After RBS terminated the Aspen Knolls Contract and the Bedford Subcontract in July 1993, RBS held discussions with Aspen Knolls. Always a part of these discussions was the topic of making all of the subcontractors whole. RBS provided Aspen Knolls with detailed amounts of what RBS felt would need to be paid contractors, including Bedford's documentation of the amount claimed to be owed it. RBS was looking to Aspen Knolls to make the payment.

Bedford's Banks had met in August 1993 with RBS's Sholos and Knott to discuss getting Bedford's claims paid. Bedford requested payment of $860,987.68, and submitted a sheet entitled "RBS SUMMARY 8/18/93" to RBS to detail claims aggregating $860,987.68 for which Bedford sought payment.[56] Among the entries on the Summary were two delay claims (Delay Claims Nos. 1 and 2, in the respective amounts of $97,119.22 and $30,195.00) which were listed as "PENDING NEGOTIATION WITH RBS/AK," and which therefore did not play a part in the computation of $860,987.38 for which present reimbursement was being then sought. But the Summary further listed as owed Delay Claim No. 3 dated July 26, 1993, in the amount of $170.402.68, and this was part of the $860,987.38 requested.

By September 1993, the prospect of a payment being made by Aspen Knolls was sufficiently promising that RBS's Sholos signed a "To Whom It May Concern" letter authorizing RBS's Knott to sign RBS

---

**56.** Although Banks' testimony was the only evidence that this sheet was the sheet submitted to RBS, and although his credibility as a witness is in doubt regarding certain other matters, the court credits his testimony on this point. No one from RBS was able to contradict him (Sholos simply said he could not recall the sheet, but his memory after five years was substantially shot). Moreover, the backup for the request would have been sent to Aspen Knolls, and there is no suggestion that Aspen Knolls did not receive this backup.

checks in specified amounts (aggregating $1,202,315.80) to eight subcontractors, including a $860,987.68 check for Bedford. RBS sent copies of this letter to each of the eight subcontractors. Sholos instructed Knott that the Bank of New York, Aspen Knolls' source of funds, was going to write a two-party check to pay each subcontractor on the list via a check made payable jointly to RBS and the respective subcontractor, and that the letter would authorize him to sign the check on behalf of RBS so that the subcontractor would get their money from Aspen Knolls. The court cannot infer any admission by RBS of a liability to Bedford for delay damages. At most, it agreed to pay Bedford if Aspen Knolls paid for the delay damages. Unfortunately, Aspen Knolls never paid RBS anything for Bedford's delay damages.

### E.

*Custom and usage in the New York City construction industry does not overcome the rule that RBS is not liable for damages for delay that RBS failed to cause.*

■■■■■ The rule in New York is that custom and practice may not overcome the effect of legal principles and rules laid down by the courts applicable generally to contracts of the nature at issue. *Uribe v. Merchants Bank of New York,* 91 N.Y.2d 336, 670 N.Y.S.2d 393, 693 N.E.2d 740 (1998) (claimed custom of gem merchants to hold large sums of cash in safe deposit boxes for short periods of time did not supplant generally applicable rules for construing the meaning of a provision allowing storage of "valuable papers" in the box). Bedford attempts to escape the rule of *Triangle* applicable to all construction contracts in New York by resorting to the alleged custom and usage in New York City. Although RBS could be expected to have been aware of the rule of *Triangle,* Bedford offers no reason why RBS, a Maryland company, would have reason to know of the variant custom and usage that Bedford's expert opined existed in New York City. RBS's credible conduct reveals that it was unaware of any such custom and usage: it consistently maintained that it was not responsible for the delay damages.[57] Bedford adduced no evidence to establish that RBS knew or should have known of the alleged custom and usage of the New York City construction industry concerning delay claims.[58] Under New York law, a party cannot be bound by evidence of custom and usage unless the party knew or had reason to know of its existence and nature. *Flower City Painting Contractors, Inc. v. Gumina Constr. Co.,* 591 F.2d 162, 165 (2d Cir.1979); *Natwest USA Credit Corp.,* 858 F.Supp. 401, 413 (S.D.N.Y.1994).

**57.** There is no evidence that Bedford, in response, raised custom and usage as a basis for claiming delay damages, to attempt to disabuse RBS of its assumption that delay damages caused by Aspen Knolls were not recoverable from RBS. A large part of Bedford's delay damages are for periods after RBS had advised Bedford it had no responsibility for delay damages caused by Aspen Knolls' funding problems.

**58.** Moreover, the credibility of Bedford's expert is in doubt because he opined that as a matter of custom and usage RBS would be liable for **termination damages,** whereas, as discussed above in part, a review of the Subcontract would have revealed that the clear language of the Subcontract barred such damages, a provision that as a matter of law could not be varied by custom and usage. Without review of the subcontracts upon which he based his opinion regarding **delay damages,** including any oral supplements to those subcontracts, it is difficult to be certain that his opinion was based on actual custom and usage, or instead the typical provision affirmatively placed into the parties' subcontract. If the custom is to contract for such protection, that would prove nothing.

## F.

### *RBS did not make a recovery from Aspen Knolls in arbitration proceedings for damages suffered by Bedford*

■ Bedford asserts that RBS recovered delay damages in its arbitration proceeding with Aspen Knolls, and that, accordingly, RBS should pay Beford for its delay damages. A prime contractor, who recovers from the owner on the basis of an alleged liability to the subcontractor based on the delay damages suffered by the subcontractor, is not permitted to obtain a windfall by later asserting that it had no liability to the subcontractor. *Barry, Bette & Led Duke*, 645 N.Y.S.2d at 720 n. 8. But here RBS did not assert the delay damages suffered by Bedford. RBS instead was entitled to recover its own damages based on various provisions of the Aspen Knolls Contract.[59]

## G.

### *Bedford's delay claims are overstated and largely insufficiently proven.*

■ Under New York law, in order to establish a delay claim, the

> plaintiff must show that defendant was responsible for the delay, that these delays caused delay to completion of the contract (eliminating overlapping or duplication of delays); that the plaintiff suffered damages as a result of these delays, and plaintiff must furnish some rational basis for the court to estimate those damages . . . .

**59.** This is confirmed by RBS's reply brief in the arbitration proceeding against Aspen Knolls, which reviews the various components of RBS's claim.

*Manshul Constr. Corp. v. Dormitory Auth.*, 79 A.D.2d 383, 436 N.Y.S.2d 724, 728 (1981).

As previously noted, Bedford seeks the following Delay Claims:

| | |
|---|---|
| Delay Claim # 1 . . . . . | 97,119.22 |
| Delay Claim # 2 . . . . . | 30,195.00 |
| Delay Claim # 3 . . . . . | 170,402.68 |
| Delay Claim # 4 . . . . . | 39,645.55 [60] |
| Total . . . . . . | 337,362.45 . |

These Delay Claims are comprised of two types of claims: (i) claims for labor and equipment that Bedford alleges sat idle during the two time periods in which delivery of modular units by RBS ceased temporarily; and (ii) claims for labor and equipment that Bedford claims were not used when the inventory of modular units was insufficient to employ the labor and equipment for a full day's work. *See* Trial Tr., 8/3/98 at 26 (Banks).

For a number of reasons, the court believes these claims are overstated or partially insufficiently documented. The court will attempt to address these in a further decision, but this would serve only as an alternative basis (in the event that RBS's lack of responsibility for delay does not relieve it of liability for delay damages) for disallowance of part of the delay damages.

## VIII

### INTEREST

The court concludes that none of the interest of $239,184.16 claimed by Bedford may be recovered.

### A.

The Plan Committee argues that the Subcontract did not provide for interest. By reason of N.Y. C.P.L.R. § 5001,[61] Bed-

**60.** Bedford originally claimed this amount was $37,245.55, but it subsequently claimed the amount should be $39,645.55.

**61.** N.Y. C.P.L.R. § 5001 (McKinney 2000) provides:

ford was entitled to recover interest, and, because the contract was silent regarding interest, N.Y. C.P.L.R. § 5004 [62] (in the absence of other controlling statute) entitled Bedford to recover such interest at the rate of 9% per annum.

## B.

Bedford cannot recover interest as part of its New York Lienholder Claims, for reasons already discussed. Bedford nevertheless had a general unsecured claim for interest that accrued on its claims pursuant to N.Y. C.P.L.R. §§ 5001 and 5004. Interest is allowed on unsecured claims only to the date of the filing of the debtor's petition on November 9, 1993.[63] If such interest has been timely asserted, it would be appropriate under N.Y. C.P.L.R. § 5001(b) to assess such prepetition interest on the allowed amount of each invoice from the date each invoice was to be paid and until the petition date. But Bedford failed to file a timely claim for payment of such interest as an unsecured claim. Nevertheless, if the $614,203.46 that RBS scheduled as owed Bedford as an unsecured claim has not been satisfied, Bedford could seek payment of its claim for interest.

## C.

■ The court concludes that the payment of $718,128.83 to Bedford satisfied the allowed unsecured claim that RBS scheduled as owed Bedford in the amount of $614,203.46.[64] Because Bedford filed no proof of claim, it could only look to payment of that $614,203.46 for payment of its unsecured claims and is barred by the satisfaction of the $614,203.46 from pursuing any further unsecured claims.

The schedules did not specify what Bedford's scheduled unsecured claim of

§ 5001. Interest to verdict, report or decision

(a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

(c) Specifying date; computing interest. The date from which interest is to be computed shall be specified in the verdict, report or decision. If a jury is discharged without specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit. The amount of interest shall be computed by the clerk of the court, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded.

**62.** N.Y. C.P.L.R. § 5004 (McKinney 2000) provides:

§ 5004. Rate of interest
Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute.

**63.** Under 11 U.S.C. § 502(b), upon objection to a claim:

the court ... shall determine the amount of [such] claim ... as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—
. . .
(2) such claim is for unmatured interest[.]

**64.** This issue is important only regarding whether Bedford may be paid interest as an unsecured claim. All other claims asserted by Bedford are either invalid or, if valid, can be paid as Allowed New York Lienholder Claims from the Fund.

$614,203.46 was for, although the debtor derived the amount of the claim by examining various invoices which did not include interest.

The $718,128.83 already paid by the Plan Committee was to be applied to various invoices that the Plan Committee concedes are entitled to treatment as Allowed New York Lienholder Claims. RBS scheduled the $614,203.46, as an unsecured claim, based on those invoices. Accordingly, argues the Plan Committee, the amounts scheduled as an unsecured claim for Bedford, in the amount of $614,203.46, have already been paid.

■■ The debtor's schedules filed under 11 U.S.C. § 521(1) listed Bedford as having an unsecured claim of $614,203.46 which was not scheduled as disputed, contingent or unliquidated, but did not specify the invoices or other grounds for the scheduled claim. Under 11 U.S.C. § 1111(a):

(A) A proof of claim ... is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(1) ... of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated.

The applicable rules of procedure similarly make clear that Bedford was not required to file a proof of claim if its unsecured claims were for $614,203.46 or less.[65]

Bedford was not on notice that the amount of its unsecured claims scheduled by RBS as owed in this case was limited to claims reflected in papers the debtor had examined in preparing the schedules. Accordingly, Bedford was entitled to view the schedules as applying to all of those unsecured claims owed it as a matter of non-bankruptcy law on the petition date, up to the scheduled dollar limit of $614,203.46.[66]

Nevertheless, the court agrees with the Plan Committee that the payment of the $718,128.83 to Bedford resulted in full payment of the $614,203.46 scheduled by the debtor as unsecured claims. As explained below, all of Bedford's claims, including its Allowed New York Lienholder Claims and its interest claim which is not payable as an Allowed New York Lienholder Claim, were unsecured claims, so that the $718,128.83 payment under the Plan of Bedford's undisputed New York Lienholder Claims satisfied the $614,203.46 of unsecured claims allowed by virtue of the debtor's schedules.

■■ All of Bedford's claims were unsecured claims as that term is used in the Bankruptcy Code. The Bankruptcy Code classifies creditors' claims as either secured or unsecured, and recognizes only two types of secured claims: claims secured by a lien, and claims secured by a right of setoff. 11 U.S.C. § 506(a). Characterizing Bedford's claims payable from

65. Under F.R. Bankr.P. 3003(b)(1):

The schedule of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated. It shall not be necessary for a creditor ... to file a proof of claim ... except as provided in subdivision (c)(2) of this rule.

In turn, Rule 3003(c)(2) provides:

Any creditor ... whose claim ... is not scheduled or scheduled as disputed, contin-

gent, or unliquidated shall file a proof of claim ... within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of ... distribution.

66. Rule 3003(b)(1) does not conclusively establish that a scheduled unsecured claim is valid. Rather, Rule 3003(b)(1) merely provides that such scheduling "shall constitute prima facie evidence of the validity and amount of the claims of creditors."

the Aspen Knolls New York Lienholder Distribution Fund as New York Lienholder Claims is a misnomer: these claims are not claims secured by a lien. Instead, they are a creditor's claims to the extent eligible for payment from the statutory trust established by Article 3–A of the New York Lien Law. The term "lien" "means charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37). If a trust claim were secured by a lien by virtue of the New York Lien Law, that lien would be a "statutory lien" as a "lien arising solely by force of a statute on specified circumstances or conditions," 11 U.S.C. § 101(53), and, if the trust funds have been reduced to cash in the trustee's hands on the petition date, the lien would likely be avoidable by a trustee under 11 U.S.C. § 545(2). But trust claims are not lien claims; they are, instead, an ownership of an equitable interest in the trust assets, with the trustee of the trust holding only bare legal title. Accordingly, the statutory trusts created by N.Y. Lien Law Article 3–A are not statutory liens or any other kind of lien. *See Dairy Fresh Foods, Inc. v. Ramette (In re Country Club Market, Inc.)*, 175 B.R. 1005, 1008–1009 (D.Minn.1994) (statutory trust is not a statutory lien). Accordingly, the $718,128.83 already paid to Bedford was a payment of unsecured claims.

In other words, Bedford looked for payment of its unsecured claim, first, as a claim payable from trust assets as an Allowed New York Lienholder Claim under Plan § 1.3 "to the extent it is determined to be valid under Article [3–A] of the New York Lien Law," and, second, otherwise as a non-trust claim. Its unsecured claim is an unsecured claim in the case regardless of the source of payment within the case.

RBS was trustee of the trust assets that have now become the Fund. Accordingly, under 11 U.S.C. § 541(a)(1), RBS's legal title to those trust assets became an asset of RBS's bankruptcy estate. As against RBS's bankruptcy estate (both the trust and the non-trust assets in the estate) the New York Lienholder Claims were unsecured claims and required to be scheduled as such. So the debtor scheduled Bedford as owed no more than $614,203.46 as unsecured claims—whether those claims were entitled to be asserted as New York Lienholder Claims or not.

The Plan provides for the Plan Committee to administer the trust assets that constitute the Fund. The Plan Committee is required to pay a creditor's unsecured claim first from those trust assets "to the extent it is determined to be valid under Article [3–A] of the New York Lien Law," and otherwise to pay the claim only from funds left after payment of Allowed New York Lienholder Claims. Payment of an Allowed New York Lienholder Claim, therefore, is payment on an unsecured claim, and must be treated as having been included in any amount the debtor scheduled, without any detail, as an unsecured claim owed the creditor. So by virtue of the payment of Bedford's undisputed New York Lienholder Claims, the court concludes that Bedford's scheduled unsecured claims have been paid in full.

This is not a case of Bedford being paid the $718,128.83 by a third party (say, a guarantor) and then seeking recovery of any additional unsecured claims owed it from the estate (subject to the limit of $614,203.46 allowed by virtue of the scheduling of that amount by the debtor). That would be a case of payment **outside the case** of part of its unsecured claims. Bedford would be free to seek a Plan distribution **in the case** on whatever unpaid unsecured claims remained after the payment by the third party. Here, in contrast, the payment was from the assets administered by the Plan Committee **in the case pursuant to the Plan**. The assets administered

by the Plan Committee included trust funds that the Plan Committee administered (by virtue of the estate's legal title to the trust funds), as well as non-trust assets. The payment to Bedford from assets administered **in the case** was a payment **in the case** on the part of Bedford's unsecured claims determined to be payable from the trust assets. That payment **in the case** towards Bedford's unsecured claims, in accordance with the terms of the Plan governing payment of claims, accordingly satisfied the amount that RBS scheduled as owed to Bedford as an unsecured claim **in the case**.

 Bedford was, of course, not required to file a proof claim by the bar date of March 15, 1994, in order to assert New York Lienholder Claims against the trust assets that eventually became the Fund. As a beneficiary of the statutory trust, Bedford's equitable interest in the funds could be recovered as its property without filing a proof of claim for a distribution from the estate. But the Plan, which is binding on Bedford under 11 U.S.C. § 1141(a), set up a procedure for payment of unsecured claims from either the Fund to the extent of any valid trust claims or, on a pro rata basis, from other estate assets. The payment of unsecured claims under the Plan is a payment of such unsecured claims whether the payment is from the Aspen Knolls New York Lienholder Distribution Fund or otherwise. Bedford is entitled to collect from the trust assets more than the debtor scheduled as owed Bedford, but Bedford is not entitled to collect from non-trust assets once payments on its unsecured claim from the trust assets administered under the Plan exceeded the amount the debtor scheduled as owed Bedford.